NORTHERN TRUST COMPANY, Plaintiff-Appellee, v. VIII SOUTH MICHIGAN ASSOCIATES *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—94—1883

Opinion filed November 9, 1995.—Rehearing denied December 18, 1995.

Gary A. Weintraub, James A. Chatz, and Barry A. Chatz, all of Kamensky & Rubinstein, of Lincolnwood, and George N. Vurdelja, Jr., of Vurdelja & Heaphy, of Chicago, for appellant Eight South Development Corporation.

Gary A. Weintraub, James A. Chatz, and Barry A. Chatz, all of Kamensky & Rubinstein, of Lincolnwood, for appellants James R. Loewenberg and Marvin Fitch.

George N. Vurdelja, Jr., of Vurdelja & Heaphy, of Chicago, for appellants Paul Cocose and William Cocose.

John H. Anderson and Gus A. Paloian, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

Plaintiff the Northern Trust Company (Northern) brought suit against defendants VIII South Michigan Associates, Eight South Development Corporation, James Loewenberg, Marvin Fitch, Paul Cocose and William Cocose, seeking foreclosure on a building located at 8 South Michigan Avenue as well as money damages. Eight South Development Corporation, Loewenberg, Fitch and the Cocoses brought counterclaims and affirmative defenses alleging that Northern committed fraud and breached its duty of good faith and fair dealing, had unclean hands and was equitably estopped from asserting its claims. The trial court dismissed the counterclaims and affirmative defenses and entered partial summary judgment against Loewenberg, Fitch and the Cocoses (the Guarantors) for $9,932,213.19. The Guarantors appeal from these rulings. (A stipulation was later entered dismissing Loewenberg and Fitch from this appeal.) We affirm.

The following facts are alleged by the Guarantors in their counterclaims and affirmative defenses. In late 1987, the Guarantors formed an Illinois limited partnership, VIII South Michigan Associates (VIII South), to acquire a 38-story office building located at 8 South Michigan Avenue in Chicago. The Guarantors were the officers and directors of Eight South Development Corporation, the corporate general partner of VIII South.

In December 1987, VIII South applied to Northern for a short-term acquisition loan in the amount of $7.05 million in order to purchase the 8 South Michigan Avenue building. In connection with that application, VIII South advised two of Northern's officers, vice-president John Klopp and head of Northern's commercial real estate lending division Scott Lafferty, that over half of the tenants of the building were not paying rent or were paying below current market rate and, therefore, VIII South's projections showed that the building would likely be operating with a minimal net operating income and negative cash flow in the early years. In addition, significant physical improvements to the building would become necessary as new tenants were brought into the building.

VIII South and Northern discussed the terms of the loan and the potential for renewal and extension of the loan. VIII South recognized that Northern would probably not be the source of its permanent financing and that such financing would likely be obtained instead from some other lender.

VIII South initially requested a one-year loan. VIII South contemplated that it would obtain take-out financing during the course of that year and would use part of the proceeds to pay off.

Northern's loan. Lafferty advised VIII South to seek a one-year term loan with a one-year option. Lafferty explained that this would give the partnership more flexibility in obtaining favorable permanent financing. Lafferty also indicated that, because the building would not reach full leasing capacity for several years, Northern would consider offering the partnership additional options to extend the loan term, provided that the loan was current when it became due and that the partnership was otherwise performing in conformity with its projections. Lafferty advised VIII South that Northern could not formally commit to offering it these additional option periods at the onset of the loan.

In January 1988, Northern agreed to make a loan of $7.05 million to VIII South Michigan for one year with VIII South having an option to renew the loan for a second year. The loan was secured by a mortgage and an assignment of rents on the 8 South Michigan Avenue building, and it was personally guaranteed by the Guarantors and VIII South's corporate partner pursuant to a written guaranty of payment and performance.

In August 1988, Northern increased the principal amount of the loan to VIII South by $450,000. In late 1988, VIII South was able to obtain long-term refinancing for the building from Lemont Savings and Loan (Lemont). Lemont offered to loan VIII South $11.5 million, $7.5 million of which was to be used to repay Northern and $4 million of which was to be used for tenant and capital improvements. Northern, however, encouraged VIII South to keep the loan at Northern. Lafferty advised VIII South that if it would decline financing from Lemont, Northern would renew the loan and increase the principal amount of the loan by $3 million, to $10.5 million, without seeking additional equity, collateral or guaranties. In January 1989, the term of the loan was extended for one year to January 1990, and the amount of the loan was increased by $3 million to a total of $10.5 million.

Lafferty informed Loewenberg that until the partnership obtained other reasonable take-out financing, Northern would continue to renew the loan if VIII South continued to manage and lease the building in accordance with its projections and representations. The Guarantors claim that as a result of the statements and conduct made on behalf of Northern, VIII South and the Guarantors continued to forgo other take-out opportunities that would have enabled them to retire the Northern loan and extinguish any potential liabilities arising under the guaranty.

In January 1990, VIII South borrowed an additional $300,000, and in June 1990 VIII South borrowed another $1 million, bringing

the total loan to $11.8 million. The loan maturity date was extended to September 1991. The Guarantors claim that these last two loan increases resulted in the amount of the loan further exceeding the building's market value.

Between 1988 and 1990, Guarantor Loewenberg was one of the largest customers of Northern's commercial real estate lending division. The Guarantors claim that as of 1989, Northern was also financing two other real estate partnerships in which Loewenberg was a principal owner of limited partnership interests. These were State/Delaware Associates (State/Delaware), whose principal asset was a building located at 1 East Delaware, Chicago, and Gold Coast Galleria (Gold Coast), whose principal asset was a building located at 111 West Maple, Chicago.

As a result of Northern's interest in developing a lending relationship with Loewenberg, in July 1987, Northern issued letters of credit on behalf of State/Delaware for over $2.7 million, all of which were unsecured. In late 1988, Northern also issued a letter of credit on behalf of Gold Coast in the amount of $1.4 million. In 1989, Northern increased this amount to $5 million, $2.2 million of which was unsecured. Loewenberg was a guarantor of both the State/Delaware and Gold Coast letters of credit. Neither VIII South Michigan nor the Cocoses ever owned an interest in either State/Delaware or Gold Coast, nor did VIII South or the Cocoses ever guaranty any portion of the State/Delaware or Gold Coast letters of credit. In addition, in 1988 and 1989, Northern made unsecured personal loans to Loewenberg to fund interest payments that were being made by Loewenberg on behalf of VIII South and Loewenberg for Loewenberg's other personal business needs. Unbeknownst to VIII South and to the Guarantors, during that period from 1989 through 1990, Northern was concerned over the status of its overall relationship with Loewenberg and the aggregate amount of unsecured funds lent to the partnership entities in which Loewenberg held an interest. Northern's concern over the aggregate amount of funds lent to three partnerships was premised on the facts that (1) of the approximately $7.7 million of credit extended by Northern on State/Delaware and Gold Coast, approximately $5 million was unsecured, and (2) Northern perceived itself to have extended over $22 million in related credit to Loewenberg, of which it considered over $7 million to be unsecured and at significant risk. Northern also lacked confidence in the State/Delaware and Gold Coast projects, which as early as 1989 caused Northern to downgrade these loans and place them on its "watch list." In January 1990, Northern noted in a credit committee document that a basis to consider not lending further funds to

VIII South was Northern's overall "unsecured exposure to [the] Loewenberg entities."

The Guarantors claim that as Northern's concern over its overall relationship with Loewenberg and its aggregate unsecured exposure mounted, Northern became more intent on maintaining its lending relationship with VIII South Michigan and its security interest in the building. Northern was evaluating its loans to State/Delaware and Gold Coast by aggregating them with its loan to VIII South. There were, however, no cross-collateralization agreements between the three partnerships. Northern's concern for maintaining its lending relationship with VIII South was a factor that caused Northern to thwart refinancing efforts with third-party lenders by increasing the loan by $4.3 million in 1989 and 1990 without requiring any additional collateral.

The Guarantors allege that Northern did not disclose to the partnership or the Guarantors the fact that the State/Delaware and Gold Coast loans were influencing its credit decisions with respect to VIII South. The Guarantors claim that had VIII South and the Guarantors known this, they would have retired Northern's loan and extinguished the guaranty by accepting one of the other refinancing opportunities.

In June 1990, Northern made its final advance on the loan to VIII South, increasing the principal amount of the loan by $1.3 million and extending the term of the loan for another year. The increase in principal amount was used primarily to capitalize accrued interest to pay Northern's fees. The balance was used to fund ongoing tenant improvement work.

The Guarantors allege that at or about the time Northern made its final advance in June 1990, it believed that it no longer needed the building to offset unsecured indebtedness attributable to State/Delaware and Gold Coast. Northern recognized that the amount of its unsecured debt attributable to these two partnerships had decreased. By June 1990, Northern knew that it would be virtually impossible for VIII South to obtain reasonable replacement financing during the next several years. This was so because by increasing the loan amount, Northern had caused the amount of the loan to further exceed the building's actual value.

The Guarantors allege that when Northern made its final advance in June 1990, it had already decided to foreclose on the building and that Northern made the final advance so that the partnership could finish the building's tenant improvements before Northern filed suit to obtain possession. Northern did not tell VIII South or the Guarantors that it had decided not to renew the loan and had decided to file suit instead.

Less than a year after Northern made its final advance in June 1990, Northern declared the VIII South loan in default. Northern accelerated the loan on or about April 18, 1991.

Northern filed suit against VIII South Michigan Associates, Eight South Development Corporation, and the Guarantors, seeking a judgment of foreclosure and sale in connection with the 8 South Michigan Avenue building as well as a money judgment against VIII South and Eight South Development Corporation, its general partner on certain promissory notes, and a money judgment against the Guarantors.

The Guarantors filed counterclaims and affirmative defenses incorporating the facts stated above and alleging in its counterclaims that Northern's actions were fraudulent and lacked good faith, and asserting in its affirmative defenses breach of the duty of good faith and fair dealing, unclean hands, and equitable estoppel. The trial court granted Northern's motion to dismiss the Guarantors' counterclaims and affirmative defenses, stating that these were sophisticated, knowledgeable businessmen who should not have relied on "an alleged loosely stated oral agreement" to extend the loan that varied from the parties' written agreement. In denying the Guarantors' motion for reconsideration, the trial court stated that the Guarantors "failed to have a pleading which is sufficient in law" and that the Guarantors have not stated a viable claim by making "simply conclusory statements that there was a hidden agenda" by Northern.

On April 28, 1994, the trial court granted Northern's motion for partial summary judgment and entered judgment against Eight South Development Corporation and the Guarantors, jointly and severally, in the amount of $9,932,213.19 on counts II and III of Northern's complaint.

On appeal, the Guarantors allege that the trial court: (1) improperly dismissed their counterclaim alleging fraudulent nondisclosure and lack of good faith and fair dealing; (2) improperly dismissed their affirmative defenses of breach of the implied covenant of good faith and fair dealing, unclean hands and estoppel; (3) improperly ruled that defendants' claims were barred by a prior decision in a bankruptcy action; and (4) improperly entered summary judgment against the Guarantors on their personal guarantees.

We first address the Guarantors' claim that the trial court improperly dismissed, under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)), their second amended complaint alleging fraud and breach of the implied covenant of good faith and fair dealing. In considering a motion to dismiss, all well-

pleaded facts in a complaint must be taken as true with all inferences from it to be drawn in favor of the nonmovant. (*Meerbrey v. Marshall Field & Co.* (1990), 139 Ill. 2d 455, 564 N.E.2d 1222.) Even applying this liberal standard, the Guarantors have not stated a claim for either fraud or breach of the covenant of good faith and fair dealing.

In dismissing the Guarantors' fraud count, the trial court found that the Guarantors only had standing to bring a claim for injury independent of VIII South's and not for general losses suffered by the other investors within the entity, and that there is no claim for nondisclosure unless there is a clear duty to disclose. We agree with both of these findings.

■ Limited partners do not have a cause of action for damages to their interest in a limited partnership. (*Home Saving Association v. State Bank* (N.D. Ill. 1991), 763 F. Supp. 292.) If shareholders of a corporation are injured by a diminution in the value of their shares, a shareholder cannot proceed individually to assert the corporate claim, but rather must proceed by means of a derivative suit. (See *Kennedy v. First National Bank* (1985), 129 Ill. App. 3d 633, 473 N.E.2d 604.) Limited partners are in the same position as shareholders. *Partnership Equities, Inc. v. Marten* (1982), 15 Mass. App. Ct. 42, 443 N.E.2d 134.

■ The Guarantors rely on *First National Bank v. Sylvester* (1990), 196 Ill. App. 3d 902, 554 N.E.2d 1063, for the proposition that a guarantor has standing to assert a claim for loss of investment. The *Sylvester* court, however, ruled only that the lender in that case had waived the standing argument by failing to raise it in the lower court. The *Sylvester* court did cite *Mid-State Fertilizer Co. v. Exchange National Bank* (7th Cir. 1989), 877 F.2d 1333, as authority for the rule that guarantors who suffer direct injury have standing to pursue their own remedies. *Mid-State Fertilizer* recognized, however, that when a guarantor has only a derivative injury, the investor may seek redress only in the name of the corporation. In alleging that they lost their investment in VIII South because of Northern's action, we find that the Guarantors have alleged only a derivative injury.

The trial court also determined that the Guarantors' fraud count is deficient because it fails to plead any facts indicating that Northern had a duty to disclose the allegedly concealed information. The Guarantors claim that Northern acted fraudulently in failing to disclose the manner in which it internally underwrote the VIII South loan, that in evaluating the loan it took into consideration the status of other entities in which guarantor Loewenberg had an interest and that Northern loaned more money than the building was worth. The

Guarantors also allege that Northern engaged in fraudulent conduct when it orally promised to continue to extend the term of the loan, thereby deterring the Guarantors from obtaining financing elsewhere.

■ The fact that Northern failed to disclose certain information to the Guarantors has no significance to a fraud claim unless it is shown that Northern had a duty to disclose such information. (*Magna Bank v. Jameson* (1992), 237 Ill. App. 3d 614, 604 N.E.2d 541; *Farm Credit Bank v. Isringhausen* (1991), 210 Ill. App. 3d 724, 569 N.E.2d 235.) While the Guarantors allege that Northern fraudulently concealed the manner in which the VIII South loan was underwritten internally by Northern, the law imposes no duty on banks to disclose to the borrower the manner in which the lender internally analyzes and underwrites a loan. The fact that Northern took into consideration and failed to disclose the fact that it was considering the status of other loans in which Loewenberg had an interest does not state a claim for fraud. A bank owes a borrower no duty to disclose the indebtedness of other borrowers on the same loan, and the failure to disclose this information does not constitute fraud. (*Federal Deposit Insurance Corp. v. Adam* (S.D. Tex. 1992), 803 F. Supp. 1225.) In addition, the confidentiality provisions of the Illinois Banking Act prohibit Northern from disclosing the status of loans made to other borrowers, such as those made to Loewenberg on the Gold Coast and State/Delaware properties. 205 ILCS 5/48.1 (West 1992).

Furthermore, the Guarantors claim that Northern had an obligation to inform the Guarantors that it had classified their loan as troubled. The failure to disclose a loan as troubled does not constitute the type of fraud that would enable a guarantor to avoid his liability on the guaranty. (*Centerre Bank v. Distributors, Inc.* (Mo. Ct. App. 1985), 705 S.W.2d 42.) In fact, the Guarantors in this particular case were fully aware that the 8 South Michigan Avenue building was having financial problems and that repaying the loan might be difficult. The Guarantors allege in their counterclaim that they knew that VIII South would have a negative cash flow during the two-year term of the loan and that by January 1989 the amount of the loan exceeded the value of the building. The Guarantors were familiar with the financial details and prospect of their business venture, yet they still chose to enter into the loan agreements and guaranty. Northern cannot be liable for failing to disclose to the Guarantors information of which they should have been and indeed were aware. See *McLean County Bank v. Brokaw* (1988), 119 Ill. 2d 405, 519 N.E.2d 453; *Continental Bank N.A. v. Everett* (N.D. Ill. 1991), 760 F. Supp. 713.

The lender also has no duty to refrain from making a loan if the

lender knows or should know that the borrower cannot repay the loan. (*Production Credit Association v. Croft* (1988), 143 Wis. 2d 746, 423 N.W.2d 544; *Wagner v. Benson* (1980), 101 Cal. App. 3d 27, 161 Cal. Rptr. 516.) The court in *Nymark v. Heart Federal Savings & Loan Association* (1991), 231 Cal. App. 3d 1089, 283 Cal. Rptr. 53, explained that a financial institution, acting within its conventional role as a lender of money, owes no duty of care to the borrower when preparing an appraisal of the borrower's collateral. The *Nymark* court stated that the public policy is that if financial institutions are to remain solvent, they must not be required to insure the success of every investment. To impose upon the lender a duty of care in preparing an appraisal done solely for the lender's benefit would drastically alter the risk undertaken by the lender. (See *Commercial National Bank v. Audubon Meadows Partnership* (La. Ct. App. 1990), 566 So. 2d 1136 (to impose a duty on banks to investigate and analyze the feasibility of a loan would significantly alter the relationship between banks and borrowers).) The court in *Commercial National* stated that the guarantor "should have apprised himself of the loan's ultimate use prior to obligating himself, rather than delaying until later and then attempting to seek refuge in grievances concerning [the lender's] business practices." (*Commercial National*, 566 So. 2d at 1140.) The court stated that the guarantor "obviously was aware that the principal debtor's assets alone would not support the loan inasmuch as a guarantor was needed." (*Commercial National*, 566 So. 2d at 1140.) Since Northern had no duty to disclose this information, the failure to disclose this information certainly does not constitute fraud.

■ As for Northern's alleged promise that it would continue to extend the term of the loan, this simply does not state a cause of action for fraud since the loan agreement specifically stated the term of the loan as well as the fact that the terms of the contract could not be changed by oral agreement. The documents for the VIII South loan provided that "[t]his instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought."

The Guarantors were bound by this contract and had no right to rely on oral representations changing those terms. A borrower is not justified in "relying on representations outside of or contrary to the contract he or she signs where the signer is aware of the nature of the contract and had a full opportunity to read the contract." (*CNC Service Center, Inc. v. CNC Service Center, Inc.* (N.D. Ill. 1990), 731 F. Supp. 293, 301.) A party cannot close his eyes to the contents of a

document and then claim that the other party committed fraud merely because it followed this contract. (*Bellville National Bank v. Rose* (1983), 119 Ill. App. 3d 56, 456 N.E.2d 281.) The application of this rule is particularly appropriate where the parties to the agreement are sophisticated business persons, as were all of those involved here. Two of the Guarantors owned and operated a construction company which was involved in building commercial property and another was a commercial developer. As the trial court noted, these Guarantors certainly were not neophytes.

Also damaging to the Guarantors' claim that they were fraudulently induced to turn down alternative financing on Northern's promises to extend the loan is the fact that Northern's promises were nothing more than vague assertions that it would "consider" renewing the loan. In *McClellan v. Banc Midwest* (1987), 164 Ill. App. 3d 304, 517 N.E.2d 762, the court determined that a borrower was not justified in relying upon a statement by a bank officer that he would consider further extensions of credit. Likewise, in the instant complaint, the Guarantors allege that Northern said that "the Bank would consider offering VIII South additional options periods to extend the Loan period when it became due" and that "the Bank continued to allow VIII South to reasonably believe that the Bank would continue to consider granting VIII South additional extensions of the Loan." The Guarantors also allege that these oral statements by Northern that it "would consider" renewing and extending the loan were conditioned upon the loan being "current" and "VIII South otherwise performing in conformity with its projections," and upon VIII South continuing "to manage and lease the Building in accordance with its projections and related representations," and upon "VIII South's financial projections and on actual historical performance." In *Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill. App. 3d 1090, 519 N.E.2d 957, the court found that allegations that a lender would not enforce a loan "as long as" the borrower made "progress towards profitability, had a chance at profitability," did not sufficiently plead an oral loan agreement. The allegations made by the Guarantors in their complaint do not sufficiently allege that Northern made an oral promise to renew the loan.

We therefore agree with the trial court that the Guarantors have not alleged any facts which state a claim for fraudulent nondisclosure. The Guarantors' counterclaim alleging fraudulent nondisclosure was therefore properly dismissed.

■ The trial court also properly dismissed the Guarantors' counterclaim for breach of the implied covenant of good faith and

fair dealing. Although the covenant of good faith and fair dealing is used as an aid in construing a contract, it does not form the basis of an independent tort recognized in Illinois. *Koehler v. First National Bank* (1992), 232 Ill. App. 3d 679, 597 N.E.2d 1261; *Anderson v. Burton Associates, Ltd.* (1991), 218 Ill. App. 3d 261, 578 N.E.2d 199.

The Guarantors also alleged three affirmative defenses, the implied covenant of good faith and fair dealing, unclean hands and estoppel. The trial court dismissed each of these affirmative defenses on the basis that the Guarantors failed to allege facts which would support these defenses. We agree. The Guarantors claim that Northern did not act in good faith in promising to continue to renew the loan, in using the VIII South Michigan loan to internally prop up the value of other loans, in cross-collateralizing the loan with other loans, and in deciding to foreclose on the building when it made its final advance in June 1990.

Every contract contains an implied covenant of good faith and fair dealing. (*First National Bank v. Sylvester* (1990), 196 Ill. App. 3d 902, 554 N.E.2d 1063.) The obligation of good faith and fair dealing is essentially used to determine the intent of the parties where a contract is susceptible to two conflicting constructions. (*Resolution Trust Corp. v. Holtzman* (1993), 248 Ill. App. 3d 105, 618 N.E.2d 418.) Problems involving the obligation of good faith and fair dealing generally arise where one party to a contract is given broad discretion in performance. (*Resolution Trust*, 248 Ill. App. 3d at 112.) The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. (*Continental Mobile Telephone Co v. Chicago SMSA Ltd. Partnership* (1992), 225 Ill. App. 3d 317, 587 N.E.2d 1169.) Parties to a contract, however, are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract. *Resolution Trust*, 248 Ill. App. 3d at 113.

■ As we noted above, the Guarantors have simply failed to show any wrongdoing on Northern's part. Rather, the facts alleged show that Northern did exactly what it was contractually obligated to do. The Guarantors cite *Chemical Bank v. Paul* (1993), 244 Ill. App. 3d 772, 614 N.E.2d 436, in support of their argument that Northern breached its implied covenant of good faith and fair dealing. In affirming the jury's finding that Chemical Bank did not act in good faith in enforcing the loan it made to Paul, the court noted that the bank "was granted considerable discretion in the use and application of the funds disbursed." (*Chemical Bank*, 244 Ill. App. 3d at 783.) The

facts in that case showed that Chemical Bank failed to exercise that discretion in good faith.

In the instant case, the Guarantors have alleged no facts showing that Northern abused its discretionary rights under the loan agreements. The loan agreements in this case stated that Northern would loan to VIII South $11.8 million. The Guarantors admit that this entire amount was disbursed to VIII South. There is no allegation that Northern, like Chemical Bank, had discretion as to how the disbursed funds would be applied. Rather, the facts show that Northern continued to loan VIII South money so that it could continue making improvements to the building and continue leasing the building. The covenant of good faith and fair dealing does not enable a guarantor to read an obligation into a contract that does not exist. Northern fulfilled its obligations under the loan agreement and there is no showing that it committed any wrong in failing to reveal its internal decision-making process or its classification of the loan as troubled. Northern had no obligation to renew the loan. The Guarantors have alleged no facts showing that Northern acted in bad faith in enforcing the terms of the loan.

■ The Guarantors' next affirmative defense alleges that Northern acted with unclean hands. The equitable doctrine of unclean hands provides that a party seeking equitable relief cannot take advantage of his own wrong. (*State Bank v. Sorenson* (1988), 167 Ill. App. 3d 674, 521 N.E.2d 587.) Even assuming equitable defenses would apply to this cause of action, as we have previously discussed, the Guarantors have not alleged sufficient facts to show that Northern committed any wrong. Accordingly, the trial court properly dismissed this defense.

■ The Guarantors' estoppel defense was likewise properly dismissed. A claim of promissory estoppel requires: (1) a promise, (2) which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (3) which induces such act or forbearance, and (4) which must be enforced in order to avoid injustice. (*First National Bank v. Sylvester* (1990), 196 Ill. App. 3d 902, 554 N.E.2d 1063.) The Guarantors allege that Northern informed the Guarantors that it "would consider" extending the VIII South loan when it became due and because of this promise, they declined financing from a different institution. Northern's statement, however, is insufficient to justify reliance on the part of the Guarantors. As the court noted in *McClellan*, 164 Ill. App. 3d 304, 517 N.E.2d 762, a statement by a bank officer that it would consider further extensions of credit was not a representation that would justify reliance with an expectation of future financing. We reach the same conclusion here.

In light of our decision that the trial court properly granted Northern's motion to dismiss under section 2—615, we need not address whether the trial court also properly granted Northern's motion to dismiss under section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1992)), on the basis that the Guarantors' claims and defenses were barred under the doctrines of *res judicata* and collateral estoppel. We therefore turn to the Guarantors' last argument that the trial court improperly entered summary judgment in favor of Northern and against the Guarantors in the amount of $9,932,213.19. The Guarantors claim that: (1) no deficiency judgment should have been entered since there had been no foreclosure decree and no order confirming a foreclosure sale; (2) the judgment of $9,932,213.19 was not for the correct amount; and (3) because Northern's purchase of the 8 South Michigan Avenue property was subject to Northern's first mortgage lien and several mechanics' liens against the property, which remained in place after the sale, Northern's purchase of the property "was analogous to a deed in lieu of foreclosure" and extinguished the Guarantors' liability on the guaranty.

■ We find no merit to any of the Guarantors' contentions. First, the Guarantors claim that Northern did not comply with the provisions of the Illinois Mortgage Foreclosure Law (735 ILCS 5/15—1508(e) (West 1992)). However, Northern sought and received partial summary judgment, not on its mortgage foreclosure count, but on its counts for money damages against the corporate general partner of VIII South on the VIII South promissory notes, and against the Guarantors' on the guaranty.

An action on a guaranty may be pursued separately from or concurrently with a foreclosure. (*Phelan v. Iona Savings Bank* (1892), 48 Ill. App. 171.) An action against a guarantor of a note is separate from the remedy of foreclosure and sale. (*Pedott v. Dorman* (1989), 192 Ill. App. 3d 85, 96, 548 N.E.2d 541, 548.) An unconditional guaranty does not require a creditor to attempt collection from the principal debtor or collateral before seeking collection from the guarantor. *United States v. Shirman* (N.D. Ill. 1966), 41 F.R.D. 368.

The Illinois Mortgage Foreclosure Law does not prohibit the bringing of a separate guaranty count, but rather expressly provides that such relief may be separately pursued. The statute provides that "Any party may join as a party *** (5) Guarantors, provided that in a foreclosure any such guarantor also may be joined as a party in a separate count in an action on such guarantor's guaranty." 735 ILCS 5/15—1501(b)(5) (West 1992).

The guaranty signed by the Guarantors made it perfectly clear to

the Guarantors that a separate action on the guaranty may be pursued. The guaranty "absolutely and unconditionally" guaranteed payment of the loan and the Guarantors waived "any right to require that any action be brought against the Borrower and any other person or party or to require that resort be had to any security." The guaranty further provides that Northern could enforce the guaranty "whether or not other proceedings or steps are pending or have been taken or have been concluded to enforce or otherwise realize upon the obligation of security of the Borrower." It is thus clear that Northern was not required to complete a foreclosure on any security before obtaining judgment on the Guarantors' guaranty.

The Guarantors next claim that the trial court incorrectly looked at the bankruptcy court sale of the 8 South Michigan Avenue building in order to arrive at the $9,932,213.19 judgment amount. Our review of the bankruptcy proceedings, however, shows nothing improper in the trial court in the instant case relying on the amount calculated by the bankruptcy court. The VIII South bankruptcy trustee sold the estate's interest in the ground lease. The trustee provided notice of the sale and the hearing on the sale to all creditors of the bankruptcy estate, including the Guarantors and their counsel. The trustee also published a notice once a week for three consecutive weeks of the open and public sale of the ground lease and an opportunity to bid. At the conclusion of the hearing on the trustee's sale of the ground lease, the bankruptcy judge entered an order specifically finding that the Guarantors were given a full and fair opportunity to participate and object to the sale, and they failed to object.

At the bankruptcy hearing, the expert testimony of a real estate appraiser was introduced on the issue of the fair market value of the 8 South Michigan Avenue property. The appraiser valued the ground lease at $5,650,000, which was the value of the ground lease free and clear of all liens, claims and encumbrances. The bankruptcy judge found that $5,650,000 exceeded the current market value of the ground lease, Northern submitted a bid for this amount and the bankruptcy court approved the sale of the property to Northern for this amount. The bankruptcy judge noted that Northern's bid was the highest received on the property. Northern's bid was in the form of a credit of $5,650,000 against its $15,203,649.79 secured claim against VIII South. Northern's claim against the VIII South bankruptcy estate had been filed in the amount of $12,964,024.67. This claim was not contested by the bankruptcy trustee and was allowed by the bankruptcy court without objection by the Guarantors. Two years later the amount was increased to $15,203,649.79 due to the ac-

crual of interest. Northern's claim against VIII South and the Guarantors was thus reduced by its $5,650,000. The Guarantors did not appeal from the bankruptcy court's ruling and that order is therefore final and binding on the Guarantors. The trial court therefore properly relied on the figure computed in the bankruptcy court and entered judgment in the amount of $9,932,213.19 against the Guarantors.

■ While the Guarantors claim the bankruptcy court sale was a deed in lieu of foreclosure, the bankruptcy judge specifically found that the sale by the trustee "shall not be deemed to be a deed in lieu of foreclosure under [section] 15—1401 of the Illinois Mortgage Foreclosure Law" "and does not release Eight South Development Corp. and the Guarantors from obligations they have to Northern under their personal guaranty of Northern's loan to VIII South." We therefore conclude that the trial court properly entered partial summary judgment in favor of Northern for the correct amount.

Accordingly, for the reasons set for the above, the trial court orders dismissing the Guarantors' counterclaims and affirmative defenses is affirmed, as is the trial court order granting partial summary judgment in favor of Northern.

Affirmed.

GORDON and T. O'BRIEN, JJ., concur.