Dr. Fred RICHARDSON, Jr.,
Plaintiff–Appellant,

v.

RUSH PRESBYTERIAN ST. LUKE'S
MEDICAL CENTER, et al.,
Defendants–Appellees.

No. 02–2303.

United States Court of Appeals,
Seventh Circuit.

Submitted Feb. 24, 2003.*

Decided Feb. 28, 2003.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before BAUER, CUDAHY, and KANNE, Circuit Judges.

## ORDER

Fred Richardson, an African–American physician, brought suit against Rush Presbyterian St. Luke's Medical Center, several entities affiliated with Rush, and five Rush employees, claiming violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and various state laws. Rush filed two counterclaims for breach of contract, and the defendants then moved for summary judgment as to all claims, which the district court granted. Dr. Richardson now appeals, and we affirm.

Dr. Richardson graduated from Rush Medical College in 1987, and after he had completed a three-year residency in family medicine, Rush employed him through an arrangement known as a medical service plan. Under his plan Dr. Richardson agreed to open a family practice, "Dr. Richardson's Neighborhood Family Practice," and to remit the patient fees to Rush. In exchange Rush agreed to pay Dr. Richardson's salary and overhead (which included rent, malpractice insurance, supplies, and an employee's wages). Dr. Richardson was still running the neighborhood practice five years later when Rush's board of trustees also appointed him to the newly created position of assistant dean for minority affairs at the medical college. As assistant dean Dr. Richardson worked with Rush administrators to recruit and retain minority medical students, and Rush paid Dr. Richardson additional salary for those services.

Even though the neighborhood practice was incurring annual losses of about $100,000, in 1997 Dr. Richardson announced that he wanted to discontinue his medical service plan and "transition into private practice." After his annual employment contract expired on June 30 (the end of Rush's fiscal year), Dr. Richardson and Rush began negotiating the sale of the neighborhood practice. During these negotiations Rush continued to perform its obligations under Dr. Richardson's expired contract, and Dr. Richardson likewise continued to work as an assistant dean and to remit the patient fees generated by the practice.

Then in November 1997 Dr. Richardson stopped remitting the fees. According to Dr. Richardson, he stopped paying because defendant Erich Brueschke, then the dean of the medical college, told him that he could retain the fees "in preparation for the purchase and sale of my [p]ractice." Unaware of the withholding, Rush continued negotiating and even offered a deal, which Dr. Richardson rejected, to give him the practice's assets free of any liabilities and to continue paying him $55,000 annually for his work as assistant dean for minority affairs. Rush's attitude changed, however, when in February 1998 it discovered that Dr. Richardson was withholding the fees. Rush ordered Dr. Richardson to hand over the money, and Dr. Richardson in turn demanded that Rush double the salary that it proposed to pay him as an assistant dean. Then at a meeting held to discuss the sale of the neighborhood practice, a Rush attorney allegedly threatened to sue Dr. Richardson, who responded by turning over $7,503–the fees that he had not already spent.

That same day, Dr. Richardson wrote a letter to Dr. Brueschke accusing Rush of a "conspiracy." In the letter Dr. Richardson threatened to sue for discrimination unless Rush gave him complete ownership of the neighborhood practice, permitted him to retain the withheld funds, forgave a $93,657 loan made so that he could dis-

charge his medical-school debts, contributed to the capital of the practice, promoted him to a position titled "Dean of Minority Affairs," agreed to a "lifetime" contract with annual compensation of $225,000, and met these demands by the end of the day. According to Dr. Brueschke, he thought that the letter was not only "completely unreasonable" but also "hostile and confrontational."

Despite Dr. Richardson's threat to sue immediately, he and Rush spent the next three months attempting to secure an outside mediation. During this period Rush continued to pay Dr. Richardson's salary and the neighborhood practice's expenses, and Dr. Richardson continued to withhold the fees that he generated. But when Rush finally initiated an action in state court for an accounting, Dr. Richardson promptly signed an agreement to purchase the practice. The written agreement, which superseded all earlier oral arrangements, provided that Rush would assume the practice's existing liabilities and that Dr. Richardson would receive all of the practice's assets except a security deposit and "all monies actually received by the [p]ractice prior to June 30, 1998." Because Dr. Richardson was no longer participating in a medical service plan, Rush on July 1 reduced his salary to $55,000—the amount continuously paid to Dr. Richardson as an assistant dean.

Meanwhile, Dr. Richardson was complaining about the behavior of several Rush employees. In February 1998 Dr. Richardson told Dr. Brueschke that an assistant professor of anatomy had recited a racially offensive rhyme in front of a minority student, and in May Dr. Richardson launched a "protest" of "inequalities" at Rush by briefly refusing to perform his administrative and teaching obligations at the medical college. That month Dr. Richardson also charged that defendant Edgar Staren, then the associate dean of the medical college, had behaved insensitively toward minority medical students. Dr. Brueschke investigated the accusations and sought to interview Dr. Richardson about his grievances against Dr. Staren. But Dr. Richardson refused to attend the meeting because Dr. Brueschke would not simultaneously address his requests for increased salary as an assistant dean. Because Dr. Richardson would not elaborate on the charges against Dr. Staren, Dr. Brueschke concluded that they were unfounded.

In July Dr. Richardson handed over records reflecting that during the previous fiscal year he had withheld $55,826 in patient fees and spent the money in part on lawyers' fees, lunches, charitable contributions, credit-card bills, payments to his wife, and bonuses for his employee. With the approval of Rush's president, Dr. Brueschke then fired Dr. Richardson from his position as assistant dean for minority affairs, concluding that Dr. Richardson's expenditures reflected a "completely inappropriate" use of Rush funds, that his behavior had become increasingly hostile and confrontational, and that he had leveled baseless charges against Dr. Staren.

After receiving a right-to-sue letter, Dr. Richardson filed a ten-count complaint, alleging that the defendants discriminated against him on account of his race, retaliated against him for opposing discrimination at Rush, breached three contracts, and committed various state-law torts. In addition to the events connected with his purchase of the neighborhood practice and subsequent termination, Dr. Richardson described in his complaint how the defendants allegedly had removed his name from informational resources associated with Rush, temporarily cancelled his health insurance, interfered with his pa-

tient relationships, and shortened two medical students' rotations with him.

Rush counterclaimed for the monies withheld by Dr. Richardson and the balance on the $93,657 loan given to discharge his medical-school debts, and upon the defendants' motion, the district court granted summary judgment for Rush on all claims. In a footnote to its opinion, the court said that Dr. Richardson had submitted only his own affidavit in opposition to the motion and that he had failed to file a statement of undisputed facts as required by Northern District of Illinois Local Rule 56.1. As a sanction for noncompliance with the local rule, the court assumed that the facts in the defendants' statement of undisputed facts were true. After learning that Dr. Richardson actually had prepared a statement of undisputed facts and submitted several volumes of documents in opposition to the motion, the court withdrew the footnote but left the rest of its opinion unchanged. The court then entered a final judgment fixing damages on Rush's counterclaims, and Dr. Richardson filed a timely notice of appeal and at the same time unsuccessfully moved for reconsideration.

On appeal Dr. Richardson's principal argument concerns the district court's handling of the summary judgment motion. According to Dr. Richardson, the court upon learning that he had complied with the local rules should have rewritten its opinion. By simply removing the footnote, Dr. Richardson argues, the court in the remainder of its opinion continued to incorrectly construe the facts in favor of the defendants.

Dr. Richardson's argument is unavailing given the scope of our review. We review grants of summary judgment *de novo*, meaning without deference to the views of the district judge "and hence almost as if the motion had been made to us directly."

*Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir.1993); *see also Scaife v. Racine County*, 238 F.3d 906, 907 (7th Cir. 2001). So even if we assume that the judge committed an analytical error, the error would not matter. *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir.2000). We ask simply whether on the current record—which includes all the arguments and evidence submitted by Dr. Richardson to the district court—we would have granted summary judgment. Since Dr. Richardson makes no argument about his state-law tort claims in his opening brief, we therefore will consider whether summary judgment was proper on his claims of discrimination, retaliation, and breach of contract, as well as Rush's two counterclaims.

■ Dr. Richardson argued both theories of disparate impact and disparate treatment in the district court. To establish a disparate impact claim, Dr. Richardson needed to identify a policy or practice through which Rush needlessly (though not necessarily intentionally) discriminated against African–American employees. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656–58, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir.2002). Yet on appeal Dr. Richardson does not identify any allegedly discriminatory policies or practices. He instead observes simply that between 1991 and 1996 the size of the faculty at Rush increased while the number of African–American faculty members fell by nearly half. Standing alone, this numerical evidence proves nothing. Dr. Richardson needed to connect his numbers to a Rush policy or practice that was allegedly responsible for the declining percentage of African Americans on the faculty.

As for his disparate treatment and retaliation claims, Dr. Richardson did not supply direct evidence of intentional dis-

crimination or retaliation. He instead proceeded under the approach established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case under *McDonnell Douglas* for either discrimination or retaliation, Dr. Richardson needed to show among other things that he was meeting Rush's legitimate employment expectations when he was fired. *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545–46 (7th Cir.2002) (racial discrimination); *Hilt–Dyson v. City Of Chicago,* 282 F.3d 456, 465 (7th Cir.2002) (retaliation).

■ According to Rush, Dr. Richardson performed unsatisfactorily because he misused fees collected through the neighborhood practice (and because he behaved hostilely and made groundless accusations against another doctor). Dr. Richardson responds that he actually was authorized by Dr. Brueschke to begin withholding fees in anticipation of the neighborhood practice's sale. Even so, whether Dr. Brueschke authorized withholding does not establish satisfactory performance, for Rush did not fire Dr. Richardson because he simply retained the money. Indeed, Rush continued to employ him for over six months after discovering his withholding. Rush instead fired Dr. Richardson after discovering that he had spent the withheld money "inappropriately"—a conclusion that Dr. Richardson cannot rebut because he confesses to using the funds in part to pay expenses unrelated to his practice.

■ Dr. Richardson's contentions about his state-law breach of contract claims are equally unpersuasive and do not require extended discussion. Dr. Richardson argues, for example, that triable issues exist whether defendant Health Associates, an entity affiliated with Rush, breached its agreement to advertise his services and refer patients to him. But in support of his argument Dr. Richardson cites only the affidavit of his employee and patient, Angela Lampkin, who attested that she was "informed by other patients" that Health Associates was not fulfilling its obligations. Lampkin's averment is inadmissible hearsay and is not based upon her personal knowledge, so it cannot be used to defeat a motion for summary judgment. *Martin v. Shawano–Gresham Sch. Dist.,* 295 F.3d 701, 713 (7th Cir.2002). Dr. Richardson also says that summary judgment was improper on his claim that Rush breached an agreement to pay him $110,000 annually for his work as an assistant dean. In his deposition Dr. Richardson effectively conceded, however, that Rush never accepted his proposal to increase his salary to that level. Dr. Richardson finally argues that factual questions exist whether under Rush's bylaws Dr. Brueschke needed approval from the board of trustees to fire him from his position as an assistant dean. But nothing in the bylaws requires board approval to *fire* an assistant dean. As Rush's CEO explained in his written declaration, approval is required only to *hire* assistant deans.

■ That leaves Rush's counterclaims for the fees withheld by Dr. Richardson and the unpaid balance on the $93,657 loan. The counterclaims fell within the district court's supplemental jurisdiction, *Rothman v. Emory Univ.,* 123 F.3d 446, 454 (7th Cir.1997); *see also Oak Park Trust & Sav. Bank v. Therkildsen,* 209 F.3d 648, 651 (7th Cir.2000), and we agree that summary judgment was proper as to each. With respect to Rush's counterclaim for the withheld fees, Dr. Richardson recognizes that in the contract terminating his medical service plan the fees were excluded from the assets transferred to him. Nonetheless, Dr. Richardson argues that the contractual provision excluding the

fees is unenforceable because Rush's attorneys "secretly added" the provision before presenting the contract to him. But Dr. Richardson *signed* the agreement, and he offers no evidence that he was unable to read and understand the contract at that time. Under Illinois law having an opportunity to read and sign a contract defeats Dr. Richardson's charge of fraud. *Nilsson v. NBD Bank of Ill.*, 313 Ill.App.3d 751, 247 Ill.Dec. 1, 731 N.E.2d 774, 783 (1999); *N. Trust Co. v. VIII S. Mich. Assocs.*, 276 Ill.App.3d 355, 212 Ill.Dec. 750, 657 N.E.2d 1095, 1103 (1995).

As for Rush's counterclaim for the unpaid balance on the $93,657 loan, Dr. Richardson contends that he had no obligation to pay because of a contemporaneous agreement that he made with Dr. Brueschke. The agreement provides in part, "Should you terminate your employment with Rush the repayment of the unpaid balance of this promissory note will be negotiated between yourself and the Dean of Rush Medical College in a manner which is satisfactory to the Dean." The parties assume that the provision is enforceable. And although the agreement does not define the circumstances that would trigger Rush's obligation to renegotiate, Dr. Richardson, by the argument he has made, concedes implicitly that the obligation would arise only if he ended his relationship with Rush, and not if Rush terminated him. Dr. Richardson says that he terminated the relationship when he purchased his practice and Rush stopped paying him a salary under his medical service plan. But ending the medical service plan only altered Dr. Richardson's employment with Rush, for after that event he continued to be employed as the assistant dean for minority affairs. Dr.

Richardson's employment "terminated" when he was fired as an assistant dean.

AFFIRMED.