# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1488

IN THE MATTER OF:

KMART CORPORATION,

*Debtor-Appellee*

APPEAL OF:

CAPITAL ONE BANK; CAPITAL ONE, F.S.B.;
and CAPITAL ONE SERVICES, INC.,

*Appellants*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 8625—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED OCTOBER 28, 2005—DECIDED JANUARY 4, 2006

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. One of the many contested matters in Kmart's bankruptcy was whether the debtor could assume an executory contract with Capital One Bank providing for a co-branded credit card. Kmart wanted to continue the arrangement, while Capital One did not want its brand to be associated with a bankrupt retailer. After a trial, Bankruptcy Judge Sonderby held that Kmart is entitled to assume the contract, and District Judge Pallmeyer affirmed.

Capital One contended during the trial that Kmart was in material breach of its obligations under the agreement. If true, that would have precluded assumption unless the shortcoming had been cured and assurances of future performance given. 11 U.S.C. §365(b)(1). (We cite the Bankruptcy Code as it was before the 2005 amendments, which do not apply to this proceeding.) Kmart contended that it was in compliance and has not relied on the cure-and-assurance route. Judge Sonderby agreed with Kmart's position and allowed it to assume the contract.

About six months later Capital One ended the co-brand deal under §9.2(b) of the contract, which permits early termination in the event of "material breach" by either side. Capital One contended that, even if Kmart was performing its duties in September 2003 (when the bankruptcy court allowed it to assume the contract), it had failed to perform fully between then and March 2004 (when Capital One sent the notice of termination). Capital One Bank replaced the Kmart-brand credit cards with Capital One-brand credit cards. Kmart responded by filing suit in a Michigan state court, demanding damages. Kmart adds that by terminating the contract—rightly or wrongly—Capital One has made this appeal moot. Why decide whether it can assume an executory contract, Kmart asks, when decision cannot affect the parties' future performance under this contract?

Still, there is a controversy: Kmart wants damages for wrongful termination, and that claim is tenable only if the contract was properly assumed under §365. Knock out the bankruptcy court's assumption decision and the claim for damages disappears, because Kmart never had a right to Capital One's future performance. The posture is similar to that of a case in which a district judge issues a preliminary injunction secured by a bond, and after the court dissolves the injunction the parties debate whether the defendant can recover on the bond. Recovery is proper if the injunction should not have been issued; a concrete dispute

about damages preserves a justiciable controversy about whether the injunction was valid, even though no prospective relief remains in dispute. See *American Can Co. v. Mansukhani*, 742 F.2d 314, 320 (7th Cir. 1984).

The complication is that Kmart's suit for damages is a distinct piece of litigation, in another court. Perhaps it should not have been; as long as the dispute about assumption was festering in the bankruptcy proceedings, a claim for damages would have come within the related-dispute jurisdiction established by 28 U.S.C. §§ 157(c)(1), 1334(b). But whether or not the damages claim could or should have been filed in the bankruptcy court, it is not there. This suggests that we should follow the approach of *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), and vacate the decision, so that all issues may be litigated in Michigan. The Court assumed in *Munsingwear* that, when the only effect of deciding Case #1 would be to resolve a single issue in Case #2, then Case #1 is moot and the judgment should be vacated. As the Court wrote, vacatur "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved". *Id*. at 41. Unfortunately, however, the rights of all parties cannot be preserved by vacatur—nor could both parties' entitlements be preserved by dismissing the appeal while leaving the bankruptcy judge's decision in place, as Kmart requests. Either approach will privilege one side over the other.

Because federal bankruptcy jurisdiction is exclusive, the state court in Michigan could not decide whether Kmart was entitled to assume the contract under §365. Treating the federal proceedings as moot would leave only two possibilities. If we were to vacate the bankruptcy court's decision, then Kmart's state-court action also must be dismissed: there would be no (effective) judicial decision allowing Kmart to assume the contract, so Capital One's

decision to walk away could not be breach. That would permit the unsuccessful party in litigation under §365 to frustrate the bankruptcy judge's decision, and the other party's rights, by the expedient of refusing to carry out its side of the bargain: breach would end the §365 proceeding and at the same time prevent later claims for damages (because the order allowing the contract to be assumed would have to be vacated once either party definitively refused to perform). If instead we were to dismiss the appeal and leave the bankruptcy judge's decision in force, by analogy to *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994) (holding that vacatur is obligatory only if mootness arises from circumstances beyond the parties' control), then Capital One will be stuck with a contract (and must face the prospect of damages for breach) that may not have been assumed properly. Neither the rule "breach itself protects the breaching party from damages, because it requires vacatur of the §365 order" nor the rule "breach ensures victory for the debtor, because the appeal must be dismissed" is palatable. The only sensible thing to do is resolve the appeal on the merits; only then can both sides' rights be respected.

Judges cannot resolve moot cases, however prudent such a step might seem, but as we have observed the ongoing damages litigation shows that a justiciable controversy remains. Article III permits a federal court to resolve an issue that might control some other case. Think of the offensive use of the declaratory-judgment statute, to obtain a declaration that a claim under some other statute, in some other court, is preempted by federal law. See, e.g., *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989). Or think of insurance-coverage litigation. A sues B in state court; C, B's insurer, brings a suit in federal court seeking a declaratory judgment that the policy does not cover the events, so that it need not indemnify B, should B be held liable in the state case. No one supposes that such

litigation, a staple under the diversity jurisdiction, exceeds the judicial power under Article III just because the state court may decide in B's favor on the merits and make the federal decision irrelevant. As long as there is a risk that B will be held liable and that C called on to indemnify, there is a live controversy that a federal court may resolve.[†] Just so here: As long as the Michigan litigation is pending, and there is a risk that Capital One may be called on to pay damages for breach of a contact that, it contends, was not properly assumed in bankruptcy, there is a live controversy in the federal forum.

When opposing assumption in the bankruptcy court, Capital One argued that Kmart is in default because it is no longer a "mass merchandise retailer." A series of "whereas" clauses precedes the contract's main text. One paragraph reads: "WHEREAS, Kmart owns and operates a chain of discount retail stores and is a mass merchandise retailer". (The next clause reads: "WHEREAS, Capital One is engaged in the business of issuing, managing and servicing VISA and MasterCard branded credit card accounts".) When the contract was signed in May 2000, Kmart had about 2,200 stores; by February 2003 it was down to 1,514, and Capital One thinks that this meant that it was no longer the sort of "mass" retailer that would make a good partner even though it was still one of the ten largest retail chains in the nation.

---

[†] See *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 532 (7th Cir. 2003); *American States Insurance Co. v. Capital Associates of Jackson County, Inc.*, 392 F.3d 939 (7th Cir. 2004). When the insurers' duty to defend the state case is not at issue, federal litigation usually should be deferred until the state court has acted. See *Lear Corp. v. Jackson Electric Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); *Nationwide Insurance Co. v. Zavalis*, 52 F.3d 689, 692-93 (7th Cir. 1995). Ripeness is not a problem in our litigation, however; the concern is that it is too late rather than too soon to adjudicate matters.

Such "WHEREAS" language divorced from the contract's substantive clauses implies that this document was drafted by someone who used a form book printed on parchment before the Linotype machine was invented. It does not, however, show that Kmart's scale is a promise, as opposed to a description. It would have been easy to state in one of the contract's substantive clauses that failure to operate at least 2,000 outlets entitled Capital One to walk away. Section 10.2 of the contract contains a long list of representations and warranties that Kmart makes to Capital One; the number of stores that Kmart will operate is not on that list. Nor does the contract otherwise imply that being a "mass merchandise retailer" (whatever that might mean) is a condition that Kmart must satisfy for the contract's five-year duration. The "WHEREAS" clause reads as an identifier—this contract is between Capital One and Kmart the national chain, rather than Kmart the mom-and-pop store in Barrow, Alaska, that has flown beneath the trademark radar. Cf. *Atlantic Mutual Insurance Co. v. Metron Engineering & Construction Co.*, 83 F.3d 897, 899 (7th Cir. 1996); *Walker v. Tucker*, 70 Ill. 527 (1873).

Capital One's position is that the negotiators had discussions that led it to think that Kmart planned to remain about the same size, and that Capital One relied on this when deciding whether to enter the arrangement. But what the negotiators said to each other is tangential, and what people in Capital One's front office *thought* is irrelevant. See *AM International, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 575 (7th Cir. 1995); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810 (7th Cir. 1987). These discussions do not resolve ambiguities in any of the contract's substantive terms and so would not be admissible under the parol evidence rule even if the contract lacked an integration clause. (Our reference to "the" parol evidence rule reflects the fact that there is widespread agreement on this proposition. The contract lacks a choice-of-law clause, and

the parties have not discussed which state's law would govern its interpretation—Capital One's brief cites only one state case, for the incorrect proposition that state law supplies the standard of appellate review in federal court, on which see *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir. 1994)—so we do not consider the possibility that an idiosyncratic version of the parol evidence rule might apply.) As it happens, however, the contract has a strong integration clause. Section 13.8 provides, among other things: "This Agreement . . . constitute[s] the entire agreement between the parties hereto relating to the subject matter hereof, and all prior negotiations and understandings, whether oral or written, are superseded hereby." Words exchanged during the negotiations are among the matters "superseded" by the written text.

Capital One contends that it is entitled to rely on the negotiations notwithstanding the integration clause, and notwithstanding the lack of any definition (in either the trade or popular culture) of "mass merchandise retailer" that would exclude a chain of 1,500 outlets from that description. But how could a bank with extensive networks of contracts benefit from destabilizing the objective reading of contracts and throwing everything up for grabs? Large enterprises depend on being able to reduce deals to writing that top officials may evaluate and approve or reject without being bound by what subordinates may have said behind their backs. They seek to insulate their bargains from hard-to-disprove (and easy-to-fabricate) claims that someone remembers saying something that might be pertinent. Getting out of a deal with Kmart a few years early would come at a very high price indeed to Capital One and all others who want their contracts to produce certainty rather than set the stage for swearing contests. We are not remotely inclined to grant Capital One's wish to make integration clauses worthless, however, and it should be thankful that its lawyers have failed in this effort. See

*Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003).

Capital One's second argument is that Kmart failed to staff the executive committee with "qualified" personnel. (The parties debate whether this contention was preserved in the bankruptcy court; to simplify matters, we assume that all of Capital One's arguments have been properly presented and preserved for appellate decision.) Section 2.6(a) of the contract establishes an executive committee to make decisions about subjects, such as marketing campaigns, that require joint action. During the bankruptcy Kmart laid off two of the three people it had named to this committee, and Capital One did not think much of the one who remained. Yet the contract provides that "[e]ither party may remove or replace, with or without cause, any member of the Executive Committee appointed by such party". That's what Kmart did. The contract does not set minimum qualifications for membership, nor does it set a minimum number of representatives that Kmart must appoint, other than what is implied by the provision that "the presence of one member from Capital One and one member from Kmart will constitute a quorum". Kmart took some months to replace the members it had laid off, but again nothing in the contract sets a time limit. The executive committee was to meet "on a regular basis once every year and as may be necessary from time to time." That afforded Kmart some leeway in the timing of appointing replacements to the committee; Capital One does not contend that a "necessary" meeting could not be held because of staffing issues.

Again Capital One wants us to disregard the language of the contract and go by its subjective belief that Kmart's representatives would hold "qualifications" satisfactory to Capital One, and in particular would be "senior" managers experienced in credit promotions. The one person who was on the committee throughout was too young and inexperienced to satisfy Capital One. What we have

said about the parol evidence rule and the integration clause applies equally to this issue. Indeed, Capital One does not offer any concrete, objective evidence that would be admissible if the integration clause did not exist; its brief emphasizes the feelings, thoughts, and suppositions of its negotiators, not any objectively demonstrable exchanges. See *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539 (7th Cir. 2000); *Bristow v. Drake Street Inc.*, 41 F.3d 345 (7th Cir. 1994); *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363 (7th Cir. 1990).

As a fallback position, Capital One contends that laying off the "qualified" committee members and replacing them (after delay) with less-experienced persons violates the covenant of good faith and fair dealing that Illinois reads into all contracts. (Capital One assumes that Illinois supplies the rule of decision, but it does not so argue—and, as we have mentioned, it does not cite a single salient state decision.) This doctrine is a rule of construction, not a stand-alone obligation, see, e.g., *L.A.P.D., Inc. v. General Electric Corp.*, 132 F.3d 402 (7th Cir. 1997) (Illinois law); *Continental Bank, N.A. v. Everett*, 964 F.2d 701 (7th Cir. 1992) (Illinois law); *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 367, 657 N.E.2d 1095, 1104 (1st Dist. 1995). There's no ambiguity in §2.6 that could be resolved through the norm of good faith. Capital One does not contend that Kmart engaged in opportunistic behavior; it is not as if Capital One had large sunk costs that Kmart sought to exploit by dragging its heels in replacing two members of the executive committee or choosing representatives with insufficient experience in the credit business. No crafty maneuver was attempted; there was accordingly no role for a doctrine of good faith to play in reading the contract to thwart self-serving cleverness. See *Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588 (7th Cir. 1991) (Wisconsin law).

Finally, Capital One insists that for about six months during its bankruptcy Kmart just didn't do *anything* under the agreement. Its energies were devoted to other topics, such as closing money-losing stores and waging a PR campaign to revive the public's estimate of the chain's stature, products, and prospects. If doing *nothing* isn't a material default, what is?, Capital One asks. But then, doing nothing is a default only if the contract requires "something," and what was the omitted something? Capital One overstates in saying that Kmart did nothing; as Capital One concedes, Kmart continued with day-to-day administration of the credit business. What it did not do for six months was make any major plans. Yet the principal bargain that the parties struck was that Capital One would acquire Kmart's customer list and the right to use its trademarks in promoting credit to consumers, to the exclusion of other financial institutions. Kmart came through with the list before it entered bankruptcy, cut off other suppliers of consumer credit, and did not interfere with Capital One's ability to use its marks in promoting credit-card distribution and consumer-credit transactions. Kmart displayed and distributed required promotional materials and applications for Capital One's cards.

The "somethings" Capital One now tells us Kmart omitted had to do with joint planning of seasonal promotional campaigns, such as those centered on Halloween. As far as we can see, however, nothing in the contract required Kmart to participate in seasonal or occasional marketing campaigns. What the contract did require was an *annual* planning and coordination exercise (that's why the executive committee had to meet at least once a year) and approval of the annual budget for promotional outlays, see §2.6(b)(iii) and Exhibit B ¶B(a)(iv); other campaigns were optional. Kmart took a breather for six months while it attended to more pressing matters. It had every right to do so. At the hearing before Judge Sonderby, Capital One

conceded that Kmart still had time, in the contract's annual cycle, to make decisions about the annual promotional budget and plan. It was accordingly not in default and was entitled to assume the contract.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*