2023 IL App (1st) 221403-U
Order filed: August 3, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1403

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| JOHN KASTL, RASHILA KASTL, STEVEN KASTL and ANGELA KASTL, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 2018 L 486 |
| ASSOCIATED BANK NATIONAL ASSOCIATION and 1st EXECUTIVE APPRAISAL SERVICES, LLC, | ) ) ) ) | Honorable Patrick J. Sherlock, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirmed the grant of summary judgment for the defendant Bank on plaintiffs' Consumer Fraud Act count. We reversed and remanded the grant of summary judgment for the Bank on plaintiffs' negligent misrepresentation count. We reversed and remanded the denial of plaintiffs' motion to reconsider the denial of leave to file a third amended complaint alleging negligent misrepresentation against co-defendant First Executive.

¶ 2    Plaintiffs, John Kastl, Rashila Kastl, Steven Kastl and Angela Kastl, appeal the order granting summary judgment for defendant, Associated Bank National Association, on plaintiffs' third amended complaint for negligent misrepresentation and breach of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2 (West 2020)). Plaintiffs also appeal the order denying their motion to reconsider the order denying them leave to file a third amended complaint alleging negligent misrepresentation against co-defendant 1st Executive Appraisal Services, LLC. We affirm the grant of summary judgment for the Bank on plaintiffs' Consumer Fraud Act claim; reverse the grant of summary judgment for the Bank on plaintiffs' negligent misrepresentation claim; reverse the denial of plaintiffs' motion to reconsider the order denying them leave to file a third amended complaint against 1st Executive; and remand for further proceedings.

¶ 3    Plaintiffs filed an amended complaint alleging that in October 2013, they met with Bank employee Ed Currie to discuss the possibility of obtaining a home construction loan. Currie explained to them that during the construction process, the loan funds would be held by Chicago Title in an escrow account. Periodically, plaintiffs' builder would submit draw requests on their Bank loan. Plaintiffs would review and sign the draw requests, after which the Bank would order an inspector to review whether the builder had performed the necessary work to justify the requested draw. After the inspector certified that the necessary work had been completed, the Bank would authorize Chicago Title to release the funds. Rashila Kastl filed an affidavit attesting to this conversation with Currie.

¶ 4    Plaintiffs subsequently entered into a construction contract with Greenview Builders to construct their new home (the Project) for $879,500 at 570 Jackson Avenue. Plaintiffs paid $175,900 directly to Greenview. The remainder of the Project and the purchase of the lot was

funded by a loan by the Bank, evidenced by a mortgage and promissory note in the amount of $1,245,650.

¶ 5      At the closing on December 11, 2013, John and Steven Kastl, by Rashila Kastl as their attorney-in-fact, entered into a construction escrow agreement with the Bank and Chicago Title. The escrow agreement was directed to the attention of the "Escrow Department" and stated:

"You are hereby authorized to enter upon the premises to conduct inspections on behalf of the lender for the purpose of determining whether payment to the general contractor is warranted. It is understood that the inspections which you may conduct are for the direct benefit of the lender only, their purpose being to assure lender that the stage of construction substantially justifies payment to the general contractor and substantially complies with the plans and specifications submitted to you. [Plaintiffs] acknowledge that it will be their responsibility to assure themselves that the quality of workmanship and material is satisfactory, and that the home is buil[t] in accordance with plans and specifications, and [plaintiffs] further acknowledge and agree that it is not your obligation to make any assurances to them as to the quality of workmanship and materials and that you have no liability to them for any alleged defect or defects in said quality or for any failure to complete the home in accordance with plans and specifications."

¶ 6      John and Steven Kastl, by Rashila Kastl as their attorney-in-fact, also entered into a disbursement agreement with the Bank and Chicago Title. The disbursement agreement stated that prior to each disbursement of funds by Chicago Title,  plaintiffs shall furnish it with: a sworn owner's statement and a sworn statement by the general contractor disclosing the various contracts entered into relating to the construction of the home; sufficient funds to cover the current disbursement request; written approval by plaintiffs of Chicago Title's payment of the current

construction draw; a report by the inspector certifying that work has been completed and materials are in place as indicated by the current construction draw request; and statements, waivers, affidavits, and releases of lien from such persons and in such form as may be required by Chicago Title for the purpose of providing the title insurance coverage.

¶ 7 Plaintiffs pleaded that during the closing, the Bank demanded that they pay $900 to perform the required inspections and informed them that "No draws would be approved until an inspection is done." Plaintiffs paid the $900. Rashila Kastl also attested in her affidavit that "[i]n reliance on the Bank's assurance that Project inspection reports showing adequate completion of the Project would be completed by the Bank before any draws on our loan with the Bank were paid out, we agreed to and did pay the Bank $900 at closing to perform the Property inspections prior to disbursement of construction draws."

¶ 8 After the closing, the Bank sent plaintiffs a document entitled "Construction Draws Procedures and Policies," stating that plaintiffs were responsible for providing signed authorizations of the general contractor's draw requests. Once the signed authorization and other necessary paperwork are received, Chicago Title will "complete a construction draw disbursement request and send it to Associated Bank, Contract Servicing. Upon receipt of the completed inspection and the completed draw request, Contract Servicing will review the information, verify the draw can be completed and disburse accordingly."

¶ 9 The Construction Draws Procedures and Policies further stated:

"Percentage amount drawn after disbursement of each draw should be in line with percentage complete as determined by the inspection. For an example if a total construction contract is for $300,000 and $150,000 will have been drawn after the draw in question is

made, the corresponding inspection report should indicate that 50% or more of the total project is complete."

¶ 10    Plaintiffs pleaded that because they had no experience with construction or inspecting home construction, they trusted the Bank to conduct the inspections and to perform them properly.

¶ 11    During construction, plaintiffs approved four draws from Greenview: (1) Rashila executed a sworn owner's statement for $74,047 (the first draw) on September 11, 2014; (2) John executed a sworn owner's statement for $123,664.46 (the second draw) on January 20, 2015;  (3) Rashila executed a sworn owner's statement for $120,200 (the third draw) on February 27, 2015; and (4) Rashila executed a sworn owner's statement for $101,000 (the fourth draw) on April 24, 2015. Plaintiffs' complaint is based on the second and third draws only.

¶ 12    To conduct its inspections of the Property, the Bank hired 1st Executive Appraisal Services. With respect to the second draw, on January 21, 2015, Lynne Zaehler, a "team lead" of the Bank's mortgage group, emailed 1st Executive a request to conduct an inspection report of the Property.

¶ 13    On January 26, 2015, 1st Executive sent the Bank its completed inspection report, which stated, "The subject property was inspected on 01/26/2015" and that "[a]s of the date of the inspection, the subject property is approximately 29% complete." The inspection report further stated that its purpose was "to provide the lender/client with an accurate update of an appraisal and/or to report a certification of completion." Its "intended use" was "for the lender/client to evaluate the property that is the subject of this report to determine if the property has declined in value since the date of the original appraisal for a mortgage finance transaction."

¶ 14    On January 27, 2015, the Bank sent 1st Executive a check for an "Inspection Fee" of $125 from plaintiffs' escrow account. Also on January 27, 2015, Teresa Haga, a Bank employee, sent Chicago Title a document entitled "Certificate As To Completion" stating: "The undersigned

hereby certifies that all work for which payment is requested *** in the amount of 123664.76 has been satisfactorily completed and all materials are in place." The Certificate As To Completion was signed and dated by Haga.

¶ 15    John Kastl submitted an affidavit stating that "In January 2015, the Kastls (through their agent Chicago Title) paid Greenview out of our bank loan its requested draw of $123,664.76 in reliance on the Bank's Certificate As To Completion."

¶ 16    For the third draw request a month later, the Bank again emailed 1st Executive its inspection request. On March 4, 2015, 1st Executive sent the Bank its completed inspection report, which stated that as of the date of the inspection on March 3, 2015, "the subject property is approximately 36% complete." The inspection report again stated that its purpose was to provide the lender/client with an accurate update of an appraisal and/or to report a certificate of completion and was intended to be used by the lender/client to determine if the property had declined in value since the date of the original appraisal.

¶ 17    On March 5, 2015, the Bank sent 1st Executive a check for an "Inspection Fee" of $125 from plaintiffs' escrow account. Also on March 5, 2015, Haga sent Chicago Title a signed, Certificate As To Completion stating that she certified that all work for which Greenview requested payment of $120,200 "has been satisfactorily completed and all materials are in place." John Kastl attested in his affidavit that Chicago Title paid Greenview's requested draw "in reliance on [the] Bank's Certificate As To Completion."

¶ 18    Rashila Kastl testified at her deposition that in April 2015, she and her husband John were renting a house two miles away from the Property. She drove by the Property every day and noticed that, starting at the end of March or early April, the subcontractors had stopped performing work.

Alan Langsam, Greenview's project controller and CFO, testified in his deposition that around this time, Greenview ran out of funds to make payroll and ceased performing construction work.

¶ 19    In late April 2015, Chicago Title declined Greenview's fourth draw request because there were insufficient funds left on the loan to finish the construction.

¶ 20    Rashila attested in her affidavit that plaintiffs repeatedly talked with the Bank and with Greenview over the next few weeks to try and find out the problem. The Bank told plaintiffs that Greenview merely had to adjust its accounting procedures. Greenview told plaintiffs that "they were confused because the Bank had changed the way these [draw] requests were being approved."

¶ 21    Rashila further attested that on May 15, 2015, plaintiffs talked with Currie about their options to continue building on the Property. Currie suggested that plaintiffs could work with a different builder, but that they would have to go through a refinancing process that could take up to 45 days to complete. Plaintiffs responded that they wanted Greenview to complete the project because they had a fixed-price contract with Greenview "lower than other builders." Plaintiffs also wanted to avoid the 45-day delay in refinancing with a new builder. Currie responded that "if the Bank received certain documents from Greenview then the Bank could approve a new loan amount with Greenview and get the financing started."

¶ 22    Meanwhile, in June 2015, Steven Opichka, a senior Director of Operations with the Bank's residential lending department, sent Scott Stiverson, a Bank employee, an email relating how the Bank had worked with Greenview since 2009 and currently had 17 construction loans with Greenview as the builder of homes in various stages of completion. The Bank recently had learned that Greenview engaged in the practice of underbidding on projects and thus the cost of completing the construction of the 17 homes will be more costly than the Bank originally had anticipated. Stiverson replied with an email also informing that Greenview had been caught underbidding on

projects and engaging in "fraud." Anita Fehler, a Vice President in the Bank's residential lending department, sent an email to Opichka and other Bank employees on June 30, 2015, stating that when refinancing construction loans involving Greenview, the Bank should recommend that the borrower "remove" Greenview "from the transaction" and enter into a contract with a new builder. Fehler subsequently filed an affidavit attesting:

> "It is the Bank's policy, and it was the Bank's policy from 2013 to 2015, that the Bank does not advise its customers on what general contractors its customers may or may not utilize in connection with their residential construction projects. At no time did the Bank adopt any policy (a) which would prohibit a customer from utilizing Greenview as his or her general contractor, or (b) pursuant to which the Bank would refuse to evaluate a customer's loan or loan refinance application if the general contractor chosen by the customer was Greenview."

¶ 23    Rashila attested that throughout June and July 2015, plaintiffs provided the Bank with all requested documents for the refinancing of their loan, but heard nothing back from the Bank. In her deposition testimony, Rashida stated that she was not certain whether she personally sent the Bank all the requested documents, but she was confident that the Bank had received them all because Currie's supervisor, John Horton, never told her otherwise. Plaintiffs met with some other builders and learned that there would be a $300,000 cost increase to complete construction of the Project, regardless of whether they retained Greenview or hired one of the other builders.

¶ 24    Rashila attested that on July 8, 2015, she spoke with Horton, who told her that "staying with Greenview is totally up to you. If that is something you wish to do, we will be happy to work with you going forward." Neither Horton nor anyone else from the Bank informed plaintiffs about

Greenview's suspected fraud or about the Bank's preference for refinancing construction loans to remove Greenview as the general contractor.

¶ 25    In reliance on the Bank's promises that it would consider refinancing a new loan allowing them to retain Greenview as general contractor, plaintiffs delayed obtaining financing to complete construction with a new builder. Rashida testified in her deposition that in August 2015, plaintiffs finally decided to hire a new builder because they "could not get any answer from the Bank" as to whether it would allow them to refinance their loan so as to retain Greenview. Plaintiffs were concerned that the delay in construction could cause permanent damage to the Property because the Property was unfinished and susceptible to water damage in the event of storms. Plaintiffs' fears eventually came true as storms caused severe damage to the wood structure and plywood floors, as well as mold growth on all floors, wall studs, and support wood members, necessitating demolition.

¶ 26    In October 2015, plaintiffs hired another builder. In November 2015, plaintiffs refinanced a more expensive loan with the Bank, costing them  an additional $144,000, in order to completely rebuild their home. Greenview and its owner filed for bankruptcy protection in 2016 and 2017, respectively.

¶ 27    Meanwhile, plaintiffs' expert, Robert Kirk, an architect, reviewed the Bank's payouts for the Project and he filed a report critical of the Bank's process of inspecting Greenview's work and granting its first three draw requests. Kirk found that the Bank "carelessly provided appraisals without proper investigation or required due diligence" and approved payment for construction costs twice the amount of construction actually performed, including $35,000 for cabinets that were not in place.

¶ 28    John Kastl attested in his affidavit:

"Due to the Bank's negligent misstatement to plaintiff's agent Chicago Title, plaintiffs improperly paid out money on construction loan draw requests of $123,664 and $120,000 for work that was not actually performed, including cabinetry not installed and purported payment for subcontractor bills that had not actually been paid. [Plaintiffs] had acted in reliance on the truth of the reports by authorizing disbursement of their money to Greenview by their agent Chicago Title in accordance with the Inspection Reports and assertions of sufficient work in place for the draw amounts requested.

If the Bank had not negligently conducted the Property inspections but instead had shown the accurate amount of construction completion at the Property, the construction draws to Greenview for January and March 2015 would not have been allowed or would at least have been greatly reduced. In addition, the negligent Property inspections allowed Greenview to escape detection of its fraudulent diversion of construction funds into cash for Greenview, resulting in inadequate construction to protect the Property from weather and causing physical damage to the Property's construction which did take place."

¶ 29   In their amended complaint, plaintiffs pleaded that the Bank engaged in negligent misrepresentation when its agent, 1st Executive, issued the two inspection reports in January and March 2015 falsely stating, respectively, that Greenview had completed 29% and then 36% of the construction. The Bank further engaged in negligent misrepresentation by issuing the Certificates As To Completion certifying that Greenview had performed and completed all the work necessary for payment of their draw requests.

¶ 30   In a separate count, plaintiffs pleaded a negligent misrepresentation claim directly against 1st Executive based on its issuing of the inspection reports.

¶ 31    Plaintiffs also pleaded that the Bank violated the Consumer Fraud Act in pertinent part by misrepresenting its willingness to refinance a new Greenview loan for plaintiffs, thereby inducing them to delay hiring a different builder. The result of the delay is that the partially constructed home on their Property suffered serious weather-related damage and had to be rebuilt with a more expensive loan.

¶ 32    The circuit court granted 1st Executive's motion to dismiss the negligent misrepresentation count against it pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2018)) because the inspection reports clearly state that their purpose was only to provide the Bank with information concerning Greenview's completion of the construction. Thus, 1st Executive's duty was owed to the Bank and not to plaintiffs. The court further found that plaintiffs had failed to plead their reliance on the inspection reports when agreeing to disburse funds to Greenview.

¶ 33    Plaintiffs subsequently attempted to replead their negligent misrepresentation count against 1st Executive in a proposed third amended complaint, for which they asked leave to file.

¶ 34    The circuit court denied plaintiffs' motion to replead the negligent misrepresentation count against 1st Executive, finding: "The current proposed amended complaint fails to correct the failings of the previous complaint."

¶ 35    Plaintiffs filed a motion to reconsider, which the circuit court denied. The court ordered plaintiffs to refile the third amended complaint without the stricken count against 1st Executive.

¶ 36    Plaintiffs refiled the third amended complaint against the Bank[1], alleging that it engaged in negligent misrepresentation when its agent, 1st Executive, issued the two inspection reports in January and March 2015 falsely stating, respectively, that Greenview had completed 29% and then

---

[1] Other defendants were dismissed and are not parties to this appeal.

36% of the construction. The Bank further engaged in negligent misrepresentation by issuing the Certificates As To Completion certifying that Greenview had completed all the work necessary for payment of its draw requests.

¶ 37    Plaintiffs also pleaded that the Bank violated the Consumer Fraud Act by engaging "in a fraudulent scheme known as the 'bait-and-switch', where a seller insincerely promotes an attractively low-priced product which it does not actually intend to sell in order to place the victim in a situation where they eventually buy a higher-priced more profitable product." See *Chandler v. American General Finance, Inc.*, 329 Ill. App. 3d 729, 739-40 (2002). In this case, the bait was the Bank's promise that it would consider refinancing plaintiffs' loan so as to allow them to continue to use Greenview as their builder and finish the construction at the lowest possible price. However, the Bank "was lying to [plaintiffs] and never even considered a refinancing loan with Greenview, because the Bank knew Greenview had engaged in fraud and was a defunct entity (but did not disclose any of this to [plaintiffs])." The switch came after plaintiffs waited several months for the Bank to agree to the refinance, during which time the unfinished Property was exposed to rains causing mold and other damage necessitating a complete rebuild. "At that point, [plaintiffs] had to refinance with the Bank a more expensive loan [with a different builder] with the additional $144,000 to pay for a brand new structure, from which the Bank reaped additional profits."

¶ 38    The Bank filed a motion for summary judgment on the negligent misrepresentation and Consumer Fraud Act counts. As to the negligent misrepresentation count, the Bank argued that it owed no duty to plaintiffs to supply inspection reports to Chicago Title and that neither plaintiffs nor Chicago Title relied on the accuracy of the inspection reports prior to disbursing the monies to Greenview. In support, the Bank cited the attached affidavit of Carlos Restrepo, a construction

escrow administrator at Chicago Title, who attested that Chicago Title never received any inspection reports in connection with plaintiff's Project.

¶ 39    The Bank also argued that plaintiffs' negligent misrepresentation claim is barred by the economic loss doctrine stated in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982), and that the Consumer Fraud Act count fails because the Bank did not engage in a fraudulent bait-and-switch.

¶ 40    The circuit court granted the Bank's motion for summary judgment. Plaintiffs appeal.

¶ 41    First, we address the circuit court's grant of summary judgment on plaintiffs' negligent misrepresentation claim against the Bank. Summary judgment is appropriate when the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Northbrook Bank & Trust Co. v. 2120 Division LLC*, 2015 IL App (1st) 133426, ¶ 38. Review is *de novo*. *Id.*

¶ 42    Our supreme court recognized the tort of negligent misrepresentation in *Rozny v. Marnul*, 43 Ill. 2d 54 (1969), approving of the reasoning found in the Restatement (Second) of Torts § 552. Section 552 states:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552(1) (1977).

¶ 43    To state a claim for negligent misrepresentation, plaintiff must allege: (1) defendant's false statement of material fact; (2) defendant's carelessness or negligence in ascertaining the truth of the statement; (3) defendant's intention to induce plaintiff to act; (4) action by plaintiff in reliance on the truth of the statement; (5) damage to plaintiff resulting from such reliance; and (6) a duty on defendant to communicate accurate information. *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326, 334-35 (2006).

¶ 44    In the instant case, plaintiffs' negligent misrepresentation claim relates to the allegedly false information supplied by: (1) the inspection reports regarding the amount of construction completed by Greenview; and (2) the "Certificates As To Completion" stating that the Bank certified that all work for which Greenview requested payment had been satisfactorily completed. The Bank argues that it owed no duty to plaintiffs in the preparation of either the inspection reports or the Certificates As To Completion because: (1) the disbursement agreement stated that it was plaintiffs' obligation—not the Bank's—to provide Chicago Title with an inspection report; (2) the escrow agreement specifically stated that inspections are conducted "for the direct benefit of the lender only"; (3) Chris Tessmann, the Bank's residential loan servicing technician, attested that the inspection reports it orders (and upon which it relied when sending the Certificates As To Completion) are for the Bank's own internal review and not intended to be reviewed or relied on by the Bank's customers or the escrowee; and (4) Curt Kolell, the Bank's chief appraisal officer, attested that the Bank's internal review of appraisals is done solely for assisting it in making lending and credit decisions and is not done for the guidance of the Bank's customers. Further, the Bank contends it owed no duty to plaintiffs to inspect the Property because the mortgage provides that it is *plaintiffs'* duty to "maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition."

¶ 45    *Duhl v. Nash Realty, Inc.*, 102 Ill. App. 3d 483, is informative on the Bank's duty here. In *Duhl*, Michael and Judith Duhl (plaintiffs) brought a negligent misrepresentation claim against a real estate agent who allegedly misrepresented the value of plaintiffs' home for purposes of a sale. *Id.* at 485-87. The issue on appeal was whether the real estate agency owed plaintiffs a duty in the absence of a  brokerage agreement between the parties. *Id.* at 493. The appellate court held:

> "[I]t is elementary tort law that when one undertakes to perform a task, one assumes the duty to use proper care in the performance of the task. (Citation.) Here, accepting the allegations of the complaint, the defendants undertook to evaluate the plaintiffs' property and to advise them as to what price it could be sold for and how quickly. Not only did the defendants undertake the task, but they repeatedly represented their expertise in the field and their ability to make valuations and representations which could be relied upon. Having undertaken this, defendants had a duty to plaintiffs not to act negligently in rendering this service." *Id.*

¶ 46    In the present case, Rashila attested in her uncontradicted affidavit that Bank employee Ed Currie informed her that whenever Greenview made a draw request, the Bank would undertake the duty of ordering an inspector to evaluate whether all the necessary work had been completed to justify the draw and that no draws would be approved without such a Bank inspection. As in *Duhl*, the Bank's decision to perform the inspection of plaintiffs' property imposed the duty on it not to act negligently in rendering this service.

¶ 47    The Bank argues, though, that plaintiffs seek only economic damages and that under *Moorman*'s economic loss doctrine, the supreme court has held:

> "Where, as here, purely economic damages are sought, this court has imposed a duty on a party to avoid negligently conveying false information only if the party is in the

business of supplying information for the guidance of others in their business transactions."

*First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326, 335 (2006) (citing

*Brogan v. Mitchell International, Inc.*, 181 Ill. 2d 178, 183-84 (1998) and *Moorman*, 91

Ill. 2d at 89).

¶ 48    The Bank contends that it was not in the business of supplying inspections or Certificates

As To Completion for the benefit or guidance of its customers, as required to establish a duty under

*Moorman*'s economic loss doctrine. To determine whether a party is in the business of supplying

information for the purposes of imposing a duty under *Moorman*, the precise facts of the specific

case must be analyzed. *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 308 Ill. App. 3d 18, 26 (1999).

¶ 49    When the negligent misrepresentation is contained within information that is incidental or

ancillary to a tangible product, such as an architect's drawings for a building, the accuracy of such

information can be memorialized in contract terms and defendant is not deemed to be in the

business of providing information and is not liable for the tort of negligent misrepresentation. *First*

*Midwest Bank, N.A.*, 218 Ill. 2d at 339-40;  *Fox Associates, Inc. v. Robert Half International*, 334

Ill. App. 3d at 95. If the information is an end to itself, central to the business transaction, and is

not otherwise incorporated into a tangible object, such as a legal brief prepared by an attorney or

a financial statement prepared by an accountant, then defendant is deemed to be in the business of

providing information and is liable for any negligent misrepresentation contained in the

information provided. See *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160,

168-69 (1997); *Tolan & Son*, 308 Ill. App. 3d at 29.

¶ 50    In the instant case, the Bank argues that it is not subject to the tort of negligent

misrepresentation under *Moorman* because the inspection reports and Certificates As To

Completion were ancillary to and incorporated in a tangible product: the construction loan and

mortgage and note. See *Jones v. Countrywide Home Loans, Inc.*, 2010 WL 551418, * 5 (holding that plaintiff's negligent misrepresentation claim failed because the mortgage loan was a tangible product and the information provided at closing was ancillary thereto). However, unlike *Jones*, the inspection reports and Certificates As To Completion were issued more than a year *after* the closing on the loan and were addressed only to Greenview's draw requests. The value of the services provided in the inspection reports and certificates lied in their analysis and conclusions as to whether Greenview's construction on the Project justified its draw requests; in other words, the end product was the information and analysis provided and not any tangible documents or other objects into which the information was incorporated. The allegedly false information contained in the inspection reports and certificates regarding the amount of construction completed by Greenview was central to the business transaction at issue, specifically, to the approval of Greenview's draws and the disbursal of funds from plaintiffs' construction loan. As such, the Bank is deemed under *Moorman* to be in the business of providing the information contained in those inspection reports and certificates and had the duty to avoid negligently conveying false information.

¶ 51    The Bank argues that *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355 (1995) compels a different result. In *Northern Trust Co.*, certain guarantors formed an Illinois limited partnership, VIII South Michigan Associates (VIII South) to acquire an office building in Chicago. *Id.* at 358. VIII South applied to the Northern Trust Company (Northern) for a short-term acquisition loan of $7.05 million. *Id.* In connection with the application, VIII South advised Northern that over half the tenants of the building were not paying rent or were paying below market rate and therefore the building likely would be operating with a minimal net operating income and negative cash flow in the early years. *Id.* Although it classified the loan as

troubled, Northern agreed to loan VIII South $7.05 million for one year with an option to renew for a second year. *Id.* at 359. Northern subsequently extended the term of the loan and increased the amount of the loan by several million dollars. *Id.*

¶ 52    Northern later brought suit against VIII South and the guarantors to foreclose. *Id.* at 362. The trial court entered judgment in favor of Northern. *Id.*

¶ 53    On appeal, the guarantors argued that Northern engaged in fraud by breaching its obligation to inform them that it had classified their loan as troubled. *Id.* at 364. The appellate court disagreed, noting that the guarantors admitted they knew that VIII South would have a negative cash flow during the term of the loan and that the amount of the loan exceeded the value of the building, yet they still agreed to enter into the loan agreements and guaranty. *Id.* Northern "cannot be liable for failing to disclose to the Guarantors information of which they should have been and indeed were aware." *Id.*

¶ 54    The appellate court further held:

"a financial institution, acting within its conventional role as a lender of money, owes no duty of care to the borrower when preparing an appraisal of the borrower's collateral. *** [T]he public policy is that if financial institutions are to remain solvent, they must not be required to insure the success of every investment. To impose upon the lender a duty of care in preparing an appraisal done solely for the lender's benefit would drastically alter the risk undertaken by the lender." *Id.* at 365.

¶ 55    The Bank argues that the rationale of *Northern Trust* should apply with "equal force" here because "[c]onstruction lending would be impracticable and the threat of financial ruin substantial if a lender was required to ensure the success of every construction project it financed." We find *Northern Trust* to be inapposite, as the instant case does not involve the Bank's initial appraisal of

plaintiffs' collateral for purposes of deciding whether to issue a loan, nor does it involve the Bank's failure to disclose information to plaintiffs of which they already were aware. Rather, this case involves a construction loan and escrow agreement requiring inspections of the subject Property to ensure that construction was proceeding at a pace justifying Greenview's draw requests. The Bank allegedly promised plaintiffs that it would provide the necessary inspections such that no draw would be approved absent a finding that the necessary construction work had been completed. It is sound public policy to require the Bank to perform the inspections with reasonable care to avoid negligently conveying false information regarding whether the completed construction work justified the amount of the draw requested. Such a requirement does not force the Bank to ensure the success of the construction project, only that it act reasonably when inspecting the Property in connection with granting/denying the builder's draw requests.

¶ 56    Next, the Bank argues that plaintiffs cannot establish their actual reliance on the truth/accuracy of the inspection reports and Certificates As To Completion because Rashila admitted in her deposition that at closing, she never had any conversations with any Bank employee that would cause her to rely on the Bank to accurately inspect the Property prior to disbursement of funds to Greenview. Further, Rashila and John admitted in their respective depositions that they did not receive the inspection reports prior to their approval of disbursement of funds to Greenview, and Carlos Restrepo similarly admitted in his affidavit that Chicago Title also did not receive the inspection reports prior to disbursal. However, in her affidavit, Rashila attested that in October 2013, *prior* to the closing, she had a conversation with Bank employee Ed Currie in which he promised her that the Bank would perform the requisite inspections and she stated:

"Because none of the Kastl family had experience with construction or inspecting home construction, we entrusted the Bank to conduct the inspections as the Bank demanded with its home building and appraisal business experience."

¶ 57    Rashila testified consistently in her deposition that "the part that [she] felt comfortable was that there's no way the Bank would approve the draw if the inspection wasn't up to their standards and that the work was being done as—as expected."

¶ 58    John similarly attested in his affidavit:

"Because none of the Kastl family had experience with construction or inspecting home construction, we entrusted the Bank to conduct the inspections as the Bank demanded for draw disbursements on its home construction loan with us, and relied on its home building and appraisal business experience. *** In reliance on the Bank's assurance that Project inspection reports showing adequate completion of the Project would be completed by the Bank before any draws on our loan with the Bank were paid out, we agreed to and did pay the Bank $900 at closing to perform the Property inspections prior to disbursement of construction draws."

¶ 59    John further attested that in reliance on the Bank's Certificates As To Completion, plaintiffs approved Greenview's second and third draws.

¶ 60    Rashila's and John's depositions and affidavits are sufficient to raise a question of material fact regarding whether Currie promised that the Bank would perform all necessary inspections before approving disbursal of funds to Greenview, and whether in accordance with those promises, plaintiffs relied on the accuracy of the Bank's inspections and Certificates As To Completion.

¶ 61    The Bank argues that plaintiffs' reliance on the accuracy of the inspection reports/Certificates As To Completion was unjustified because Rashila lived near the Project,

-20-

drove by it twice daily, and saw that the subcontractors had stopped performing work. However, Rashila testified that she drove by the Property and saw that the subcontractors had stopped performing work in late March, early April 2015, which was *after* the inspection reports/Certificates As To Completion for the second and third draws had been submitted and the funds disbursed. Rashila did not testify to having any knowledge of the subcontractors' work stoppage prior to the submission of the inspection reports/Certificates As To Completion. Rashila's testimony at least raises a question of material fact regarding whether plaintiffs' reliance on the inspection reports and certificates was reasonable.

¶ 62    The Bank next argues that plaintiff's expert, Kirk, failed to show that the Bank acted negligently in the inspection process for the second and third draws, as his report addressed only the fourth draw, which is not at issue here. To the contrary, Kirk's report addressed the first three draw requests through March 2015 and found the Bank's inspection process faulty, as it approved thousands of dollars in payments for certain construction that had never been performed. Kirk stated that as of January 25, 2016, Greenview had completed only 27% of the total construction, which was *less* than the amounts indicated in the inspection reports and certified by the Bank as having been completed in connection with the second and third draws. Kirk's report was sufficient to at least raise a question of material fact regarding whether the Bank's inspection and certification process was negligent with respect to the second and third draws.

¶ 63    The Bank also argues that plaintiffs failed to show that the inspection reports/Certificates As To Completion were intended to induce them to agree to the disbursement of funds to Greenview. We disagree. Rashila's and John's affidavits and deposition testimony indicate they agreed to the disbursement of funds to Greenview based on Currie's promises that the inspection reports/Certificates As To Completion would ensure that sufficient construction had been

completed justifying the draws. Rashila's and John's affidavits and deposition testimony at least raise a genuine issue of material fact regarding whether the Bank (through Currie) intended for the inspection reports and Certificates As To Completion to induce plaintiffs to agree to the disbursement of funds to Greenview.

¶ 64    The Bank also argues that any false statement of material fact was made by 1st Executive in its inspection reports, and that the Bank did not direct or advise 1st Executive how to conduct the inspections, "which is to say, [1st Executive] was not the Bank's agent" and therefore the Bank should not be held liable therefor. The Bank's argument fails, as its liability for negligent misrepresentation is premised on the allegedly false statements that the *Bank itself* made in the Certificates As To Completion, wherein it certified that all work for which payment was requested by Greenview had been "satisfactorily completed."  The Bank may be held liable for any negligent misrepresentations contained in those certificates.

¶ 65    Next, the Bank argues that plaintiffs failed to establish that their damages were proximately caused by the Bank. John attested to the damages proximately caused by plaintiffs' reliance on the Bank's negligent misrepresentations contained in the Certificates As To Completion, specifically, plaintiffs made payments totaling over $243,000 to Greenview for work that was not actually performed. John further attested that the Bank's negligence allowed Greenview to escape detection of its shoddy construction work on their Property, which damaged plaintiffs when Greenview's poor workmanship failed to protect the Property from rains and storms, necessitating its demolition and requiring that it be rebuilt. John's affidavit was sufficient to at least raise a genuine issue of material fact regarding whether the Bank's negligent misrepresentations proximately caused plaintiffs' damages.

¶ 66    For all the foregoing reasons, we reverse the grant of summary judgment in favor of the Bank on plaintiffs' negligent misrepresentation claim and remand for further proceedings thereon.

¶ 67    Next, we address plaintiffs' appeal from the order granting summary judgment for the Bank on their Consumer Fraud Act claim. To prevail on a consumer fraud claim, plaintiffs must show that the Bank engaged in a deceptive act or practice in the course of conduct involving trade or commerce, intending that plaintiffs rely on the deception. Plaintiffs also must show actual damage proximately caused by the deception. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 180 (2005).

¶ 68    Plaintiffs alleged that the Bank violated the Consumer Fraud Act by engaging in a fraudulent "bait-and-switch" scheme whereby the Bank baited plaintiffs by falsely promising them throughout June and July 2015 that it would consider refinancing their loan so as to allow them to continue using Greenview as their builder. According to plaintiffs, the Bank never actually intended to allow such a refinancing utilizing Greenview as the builder. The switch to a more expensive loan utilizing a different builder came after the Bank's delay in refinancing caused the unfinished Property to be exposed to the elements, necessitating a complete rebuild.

¶ 69    Plaintiffs' bait-and-switch claim fails because there was no fraudulent or deceptive bait. Anita Fehler, the Bank's residential underwriting manager, attested in her affidavit that the Bank *never* adopted a policy prohibiting its customers from using Greenview as their builder or refusing to consider a loan or refinance application if the builder chosen by the customer was Greenview. Therefore, the Bank's promises to plaintiff that it would consider such a refinancing with Greenview as the builder were not deceptive. Fehler's affidavit was uncontradicted by any other affidavit and thus must be taken as true for purposes of the Bank's summary judgment motion. *FirstMerit Bank, N.A. v. McEnery*, 2022 IL App (3d) 210306, ¶ 24.

¶ 70    There also was no *fraudulent* or *deceptive* switch into a more expensive loan with a different builder. Rashila herself admitted in her deposition that by late June 2015, Alan Langsam, Greenview's CFO, informed her that the cost of finishing the construction project had increased by about $300,000, necessitating a new loan in a higher amount to cover the increased construction costs. Rashila further testified that by late July 2015, she had sought bids from other construction companies and concluded that the costs of the rebuild would be the same (an additional $300,000) regardless of whether plaintiffs stayed with Greenview or hired a different company. Thus, the increased loan amount was necessary regardless of which company ended up finishing the construction project and the loan amount would not have differed *even if* the Bank had allowed plaintiffs to refinance while continuing to use Greenview. On these facts, plaintiffs have shown no fraudulent bait-and-switch that ended up damaging plaintiffs by costing them more money. Therefore, we affirm the grant of summary judgment in favor of the Bank on plaintiffs' Consumer Fraud Act count.

¶ 71    Next, we address plaintiffs' appeal from the denial of their motion to reconsider the denial of leave to file a third amended complaint alleging negligent misrepresentation against 1st Executive.  Plaintiffs contend that the denial of their reconsideration motion was premised on the court's finding that their negligent misrepresentation count failed to state a cause of action under section 2-615. Plaintiffs argue that the court erred in so finding and they ask us to "reverse the dismissal."

¶ 72    A section 2-615 motion challenges the legal sufficiency of the complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). When reviewing the complaint, we accept as true all well pleaded facts and all reasonable inferences that may be drawn from those facts, and consider the allegations in the light most favorable to plaintiffs. *Id.*

We also can consider exhibits attached to the complaint. *Wells v. State Farm Fire and Casualty Co.*, 2020 IL App (1st) 190631, ¶ 29. A section 2-615 dismissal should be granted only where it is clearly apparent that no set of facts can be proved that would entitle plaintiffs to recover. *Marshall*, 222 Ill. 2d at 429. Our review is *de novo*. *Id.*

¶ 73    1st Executive argues that plaintiffs' arguments for reversal of the court's section 2-615 dismissal of the third amended complaint are misplaced because the only dismissal order entered in this case was the one entered on *the amended complaint*. No dismissal order was entered on the proposed *third amended complaint* because the court never permitted plaintiffs to file the third amended complaint against 1st Executive. Thus, 1st Executive argues that plaintiffs have mis-framed the issue on this appeal by arguing for reversal of a dismissal order that was never entered, instead of arguing for reversal of the order actually entered here, specifically, the order denying plaintiffs' motion to reconsider the denial of their motion for leave to file the third amended complaint. 1st Executive asks us to dismiss plaintiffs' appeal as to it based on their failure to clearly define the issues presented. See *Williamson v. Opsahl*, 92 Ill. App. 3d 1087, 1089 (1981) ("a reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research").

¶ 74    We are able to glean from plaintiffs' briefs that they are arguing that the court's order denying the motion to reconsider was premised on its conclusion that the third amended complaint failed to cure the deficiencies of the amended complaint and did not state a cause of action under section 2-615. As such, plaintiffs have focused their argument on whether the proposed third amended complaint states a cause of action for negligent misrepresentation against 1st Executive and have cited pertinent cases in support thereof. Given that we understand the issue presented,

which is supported with pertinent authority, we deny 1st Executive's motion to dismiss and will address the issue on the merits.

¶ 75    Plaintiffs' proposed third amended complaint alleged that 1st Executive committed negligent misrepresentation by issuing inspection reports falsely showing that in January and March 2015, Greenview had respectively completed 29% and 36% of the construction of the Project. Plaintiffs alleged that 1st Executive owed them a duty when preparing the inspection reports because it was aware that the reports would be relied on by plaintiffs and their agent, Chicago Title, when deciding whether to pay Greenview's draw requests. In support, plaintiffs attached documents received by 1st Executive in connection with each draw request, including: an email from Bank agent Lynn Zaehler to Paul Szwed of 1st Executive;  a letter from Greenview to Zaehler and Chicago Title; a sworn statement from Greenview's owner; and the Bank's inspection report request to 1st Executive. These documents identified plaintiffs as the owners of the Property upon which Greenview was working and for which an inspection was needed to determine whether Greenview had completed the necessary construction justifying the payment of its draw.

¶ 76    Plaintiffs pleaded that these accumulated documents effectively put 1st Executive on notice that plaintiffs and/or their agent Chicago Title would rely on the inspection report when deciding whether to pay the draw request.

¶ 77    In their memorandum in support of the motion for leave to file the proposed third amended complaint (memorandum), plaintiffs argued that they had stated a cause of action for negligent misrepresentation in accordance with *Kelley v. Carbone*, 361 Ill. App. 3d 477 (2005). The defendants in *Kelley* were appraisers of property that plaintiffs leased and intended to purchase from the lessor. *Id.* at 479. The purchase price was based on an appraisal performed by defendants. *Id.* Plaintiffs purchased the property and later sued defendants for negligent misrepresentation,

alleging that the appraisal contained numerous errors, resulting in plaintiffs paying too high a price for the property. *Id.* The trial court dismissed the complaint with prejudice. *Id.*

¶ 78    On plaintiffs' appeal, defendants argued they owed no duty to plaintiffs because the appraisal specifically stated that it was prepared exclusively for the use of the lessor. *Id.* at 481. The appellate court held that plaintiffs had sufficiently pleaded that defendants owed them a duty:

> "The appraisal itself stated that it was to 'be used by the client to support possible future purchase agreements between the client and the current lessee of the subject property.' Plaintiffs also allege that defendants were provided with copies of the leases, which detailed plaintiffs' options to purchase the properties. Defendants knew that plaintiffs' decisions to purchase the properties would be influenced by their appraisal of the properties. Thus, plaintiffs have established that they were part of the limited class for whose guidance the appraisal was intended." *Id.*

¶ 79    In their memorandum, plaintiffs argued that *Kelley* compelled a finding that 1st Executive owed them a duty when preparing the inspection reports as 1st Executive was aware that plaintiffs were part of the limited class for whose guidance the inspection reports were intended. The circuit court disagreed, finding that plaintiffs failed to adequately allege that 1st Executive owed them a duty when preparing the inspection reports or that plaintiffs actually relied on those reports prior to agreeing to disburse funds to Greenview.

¶ 80    Plaintiffs subsequently filed their motion to reconsider and cited *21 Kristin Condominium Association, by its Board of Managers v. Pioneer Engineering & Environmental Services, LLC*, 2020 IL App (1st) 191868. In *21 Kristin*, the appellate court cited *Kelley* with approval in holding that the defendant engineer who had prepared a property condition assessment (PCA) for a condominium building owed a duty toward purchasers of the condominium units because

defendant knew the purchasers would consider the report when making the purchase decision. *Id.* ¶¶ 10-14. Defendant owed the purchasers a duty even though the PCA expressly stated that it had been prepared for the "sole use" of the condominium developer. *Id.* ¶ 14.

¶ 81    Plaintiffs here argued in their motion to reconsider that, as in *21 Kristin*, their proposed third amended complaint adequately pleaded that 1st Executive owed them a duty of care when preparing the inspection reports because it was aware that plaintiffs would rely on the inspection reports when deciding whether to pay Greenview's draws. The circuit court found no cause to reconsider its finding that plaintiffs failed to adequately plead the duty and reliance elements of a negligent misrepresentation cause of action and denied plaintiffs' motion for reconsideration. Our review is *de novo*. See *Liceaga v. Baez*, 2019 IL App (1st) 181170, ¶ 26 (where, as here, the motion to reconsider was based on the trial court's alleged misapplication of existing law, review is *de novo*).

¶ 82    Plaintiffs' proposed third amended complaint adequately alleged that 1st Executive owed a duty toward plaintiffs when preparing the inspection reports. According to the proposed third amended complaint and the attached documents received by 1st Executive in connection with the draw request, 1st Executive was aware that plaintiffs were relying on the accuracy of the inspection reports in connection with the draw process. These allegations and supporting documentation were sufficient under *Kelley* and *21 Kristin* to show that plaintiffs were part of the class for whose guidance the inspection reports were prepared.

¶ 83    1st Executive argues that plaintiffs' allegations regarding its duty toward them are contradicted by other exhibits attached to the complaint, specifically, the Construction Draws Procedures and Policies, the escrow agreement, and the inspection reports themselves. All of those exhibits indicated that the inspection reports were being done solely for the Bank's benefit and

that plaintiffs had the duty to independently assess (apart from the inspection reports) whether there was sufficient construction justifying the draw; accordingly, 1st Executive contends that the exhibits show that it owed plaintiffs no duty when preparing the inspection reports. 1st Executive cites well-established law that where there is a discrepancy or contradiction between allegations in a complaint and facts shown in an exhibit that were attached to the complaint, the exhibit will control. *Outboard Marine Corp. v. James Chisholm & Sons, Inc.*, 133 Ill. App. 3d 238, 245 (1985).

¶ 84    We find no discrepancy here as plaintiffs' allegations are that *notwithstanding* the Construction Draws Procedures and Policies, escrow agreement, and inspection reports, the other documents received by 1st Executive in connection with the draw requests were sufficient to put it on notice that plaintiffs would in fact be relying on the inspection reports during the draw process. Plaintiffs' allegations are sufficient under *Kelley* and *21 Kristin* to plead that 1st Executive owed them a duty of care when preparing the inspection reports.

¶ 85    1st Executive next argues that plaintiffs failed to adequately plead that they relied on the inspection reports, as plaintiffs admittedly approved the draw requests *prior* to ever receiving the inspection reports. Careful review of plaintiffs' proposed third amended complaint shows that they approved the draw requests only on the condition that 1st Executive would conduct an inspection of the Property and prepare an inspection report justifying the Bank in certifying that sufficient construction had been completed to support the payment of the draw. In other words, plaintiffs' approval of the draw requests relied on the safeguard that if the inspection reports revealed insufficient construction, the Bank would not certify approval and the funds would not be disbursed.

¶ 86    Plaintiffs adequately alleged the duty and reliance elements of a negligent misrepresentation cause of action against 1st Executive. Accordingly, we reverse the order denying

plaintiffs' motion to reconsider the order denying them leave to file its proposed third amended complaint alleging negligent misrepresentation against 1st Executive and remand for further proceedings.

¶ 87    For all the foregoing reasons, we affirm the grant of summary judgment in favor of the Bank on plaintiffs' Consumer Fraud Act claim; reverse the grant of summary judgment for the Bank on plaintiffs' negligent misrepresentation claim; reverse the denial of plaintiffs' motion to reconsider the denial of leave to file a third amended complaint alleging negligent misrepresentation against 1st Executive; and remand for further proceedings.

¶ 88    Affirmed in part, reversed in part, and remanded.